# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MIREDDYS GONZÁLEZ CASTELLANOS,** **Plaintiff,** **v.** **RAMÓN LUIS AYALA RODRÍGUEZ, JOHN DOE 1–3 and JANE DOE 1–3, Attorneys for Ramón Luis Ayala Rodríguez, in their personal and official capacities, FIRSTBANK PUERTO RICO, IRMA RAMOS, Senior Vice President of Retail and Commercial Banking Operations, FirstBank Puerto Rico, in her personal and official capacities, NITZA FRANCO, upon information and belief, a Branch Manager and/or supervisory banking officer of FirstBank Puerto Rico, in her personal and official capacities, EDWIN ARROYO, Chief of Operations, FirstBank Puerto Rico, in his personal and official capacities, JOHN DOE 1–5 and JANE DOE 1–5, Attorneys and/or Legal Division personnel of FirstBank Puerto Rico, in their personal and official capacities,** | **Civil Action No. 25-01669** **Jury Trial Demanded** **COUNT I** – Electronic Fund Transfer Act (15 U.S.C. §§ 1693–1693r) **COUNT II** – UCC Article 4A Violations **COUNT III** – Civil Conspiracy / Aiding & Abetting (Art. 1802) **COUNT IV** - Breach of Contract / Breach of Implied Covenant of Good Faith **COUNT V** – Negligence (Art. 1802) **COUNT VI** – Conversion (Art. 1802) **COUNT VII** – Vicarious Liability (Art. 1803) **COUNT VIII** – Direct Action Against Insurer (26 L.P.R.A. § 2003) **COUNT IX** – Breach of Fiduciary Duty & Illegal |

ORIENTAL BANK,

JOHN DOE, upon information and belief, Branch Manager of Oriental Bank, in his personal and official capacity,

JOHN DOE, upon information and belief, Chief of Operations of Oriental Bank, in his personal and official capacity,

JOHN DOE 1–5 and JANE DOE 1–5, Attorneys and/or Legal Division personnel of Oriental Bank, in their personal and official capacities,

JOHN DOE 1–5 and JANE DOE 1–5, Operations and/or ACH processing employees of Oriental Bank, in their personal and official capacities,

INSURANCE XYZ,

JOHN DOES 1–10,

JANE DOES 1–10,

Defendants.

Corporate Dissolution

COUNT X – Civil Theft / Misappropriation (Art. 1802 with federal fraud standards as analogs)

COUNT XI – Unjust Enrichment (Art. 1795)

COUNT XII – Defamation

COUNT XIII – Declaratory Judgment (28 U.S.C. §§ 2201–2202)

COUNT XIV – Injunctive Relief (Ancillary to Substantive Claims)

## COMPLAINT FOR DAMAGES, EQUITABLE RELIEF, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, DIRECT ACTION  AGAINST LIABILITY INSURER, AND OTHER RELIEF UNDER FEDERAL AND PUERTO RICO LAW

Comes now Plaintiff Mireddys González Castellanos (hereinafter "González" or "Plaintiff"), by and through the undersigned counsel, and hereby states as follows:

2

## I.    INTRODUCTION

1.    This civil action arises from the deliberate and coordinated reversal of a fully settled fifty-million-dollar electronic funds transfer belonging to Plaintiff Mireddys González Castellanos and the resulting deprivation of her property without legal authority. The conduct at issue was not the product of clerical error, automated fraud controls, or judicial intervention. Rather, as later disclosed by senior banking personnel, the reversal was the result of an internal determination made jointly by the legal divisions of FirstBank Puerto Rico and Oriental Bank, following communications and coordination involving Defendant Ramón Luis Ayala Rodríguez and his legal representatives.

2.    Plaintiff was the lawful recipient and beneficiary of a $50 million corporate dividend that was properly authorized, transmitted, and credited to her personal account through the Automated Clearing House network. After the transfer had fully settled and become final, the funds were reversed without Plaintiff's authorization, without notice, without documentation, and without any court order or statutory mandate. The banks' own senior operations officer later confirmed that the action was taken based on internal "recommendations" by the banks' legal departments rather than pursuant to any legal directive or regulatory requirement.

3.    The reversal was carried out despite the absence of any error claim by Plaintiff, despite the lack of any written instruction from an authorized

3

signatory, and despite the protections afforded to beneficiaries of electronic funds transfers under federal law, commercial banking rules, and industry operating standards. As further revealed during a recorded call, the banks acted on the basis of a verbal complaint by Defendant Ayala, who lacked authority over the accounts in question, and imposed unilateral restrictions on Plaintiff's access to her funds without judicial approval.

4. Plaintiff brings this action to hold accountable all participants in the chain of conduct that resulted in the unlawful deprivation of her property. Those participants include Defendant Ayala, his legal representatives who, upon information and belief, communicated and coordinated with the banks' legal divisions, the financial institutions themselves, and the individual bank officers, legal personnel, and operations employees who authorized, executed, or failed to prevent the reversal. Plaintiff asserts claims under federal statutes regulating electronic funds transfers, under Puerto Rico law governing tortious conduct and corporate obligations, and under equitable principles designed to prevent unjust enrichment and abuse of institutional power.

5. This action seeks redress for the intentional interference with Plaintiff's property rights, the misuse of banking authority, and the failure to comply with the clear statutory and contractual obligations imposed to protect account holders. Plaintiff seeks compensatory and equitable relief to

restore her funds, vindicate her rights, and deter similar conduct by financial institutions and their agents.

## II.   JURISDICTION AND VENUE

6.   This Court has subject-matter jurisdiction over this action pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 et seq., including Section 907 and the error-resolution and documentation provisions codified at 15 U.S.C. §§ 1693d and 1693f, as well as Regulation E, 12 C.F.R. Part 1005. Plaintiff also asserts claims arising under Article 4A of the Uniform Commercial Code, as adopted in Puerto Rico at P.R. Laws Ann. tit. 19, §§ 651–680, which governs the execution, acceptance, finality, and cancellation of electronic funds transfers conducted through federally regulated banking channels.

7.   This Court further has jurisdiction under 28 U.S.C. § 1337(a) because the claims arise from Acts of Congress regulating commerce. The EFTA, Regulation E, and the federal regulatory framework governing the Automated Clearing House ("ACH") system regulate instrumentalities of interstate commerce, including electronic payment networks operated through the Federal Reserve System. The conduct challenged in this action involved interstate electronic transmissions and ACH processing that fall squarely within the scope of federal commerce jurisdiction.

8. In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims arising under the laws of the Commonwealth of Puerto Rico, including claims for negligence, conversion, civil conspiracy, aiding and abetting, breach of contract, breach of fiduciary duty, unjust enrichment, defamation, and related equitable claims. These claims derive from the same nucleus of operative facts as the federal claims, namely the reversal of a fully settled electronic funds transfer, the imposition of unlawful account restrictions, and the deprivation of Plaintiff's property through coordinated conduct by Defendants.

9. This Court also exercises pendent-party jurisdiction under 28 U.S.C. § 1367 over all individual defendants, including bank officers, bank legal-division attorneys, operations personnel, and the legal representatives of Defendant Ramón Luis Ayala Rodríguez, because their alleged liability arises from the same course of conduct that forms the basis of the federal claims and because their participation is necessary to afford complete relief.

10. None of the discretionary exceptions to supplemental jurisdiction set forth in 28 U.S.C. § 1367(c) apply. The territorial law claims do not predominate over the federal claims, do not raise novel or complex issues of local law, and their adjudication alongside the federal claims promotes judicial economy, consistency, and fairness.

11. This Court also has ancillary and equitable jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 to grant declaratory and injunctive relief, to unwind unauthorized electronic transfers, to impose constructive trusts, to enjoin ongoing and future violations, and to award any supplemental relief necessary to effectuate the Court's judgment.

12. Venue is proper in the United States District Court for the District of Puerto Rico pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). All defendants reside in, are domiciled in, or conduct substantial business in Puerto Rico, and a substantial part of the events or omissions giving rise to the claims occurred within this District. The electronic funds transfers at issue were initiated, processed, reversed, or recorded through banking operations located in Puerto Rico, and the resulting injury was suffered by Plaintiff in Puerto Rico.

13. This Court has personal jurisdiction over all Defendants because they reside in Puerto Rico, are employed or licensed to practice within Puerto Rico, transact business within Puerto Rico, and engaged in the conduct alleged herein within the territorial boundaries of this District. The exercise of personal jurisdiction over all Defendants comports with due process and the laws of the Commonwealth of Puerto Rico.

### III.  PARTIES AND PARTICIPANTS

14. Plaintiff **Mireddys González Castellanos** is a natural person domiciled in Carolina, Puerto Rico. At all relevant times, Plaintiff served as

7

President, Chief Executive Officer, and fifty percent (50%) shareholder of **El Cartel Records, Inc.** and **Los Cangris, Inc.**, corporations duly organized under the laws of the Commonwealth of Puerto Rico. Plaintiff possessed lawful authority to manage, direct, and exercise control over the business operations, financial affairs, and corporate governance of these entities, including the execution of dividend distributions approved by corporate resolution.

15. As President and Director, Plaintiff exercised fiduciary duties of loyalty, due care, diligence, and good faith toward the corporations and their shareholders, consistent with the Puerto Rico General Corporations Act, 14 L.P.R.A. §§ 3561–3568. Her role imposed a statutory and ethical obligation to safeguard corporate assets, execute lawful distributions, and ensure compliance with all corporate resolutions, banking protocols, and financial reporting requirements.

16. Plaintiff supervised the corporations' strategic development, artistic production, licensing programs, revenue streams, marketing operations, and investment initiatives. Under Plaintiff's leadership, the corporations generated substantial value, exceeding one hundred million dollars ($100,000,000) in legitimate revenue derived from music production, licensing, endorsements, concerts, branding initiatives, and global distribution.

17. Plaintiff was an authorized and registered signatory on all relevant corporate bank accounts held at **FirstBank Puerto Rico** and exercised full legal authority to issue, approve, and validate corporate payment orders, ACH transfers, dividend distributions, and financial directives. FirstBank owed reciprocal statutory and contractual obligations to recognize Plaintiff's authority, verify instructions, and safeguard corporate deposits pursuant to federal and Puerto Rico banking law.

18. Plaintiff's status as corporate officer and co-owner existed independently of any past marital relationship with **Defendant Ramón Luis Ayala Rodríguez**. Her rights as shareholder, director, and fiduciary arose by operation of corporate statute and were not contingent upon rights vested in regards to marital community property as recognized by de Puerto Rico Civil Code. Plaintiff's equal fifty percent (50%) ownership interest conferred equal entitlement to corporate distributions, assets, management rights, and decision-making authority.

19. **Defendant Ramón Luis Ayala Rodríguez** is a natural person domiciled in Puerto Rico who, at all relevant times, was the other fifty percent (50%) shareholder, officer, and director of El Cartel Records, Inc. and Los Cangris, Inc. By virtue of that position, Ayala owed fiduciary duties of loyalty, good faith, candor, due care, and non-oppression toward Plaintiff. Upon information and belief, Ayala objected to Plaintiff's lawful receipt of corporate dividends, communicated objections to financial institutions

despite lacking signatory authority, and acted to induce or facilitate the reversal of Plaintiff's $50,000,000 dividends. As further alleged, Ayala benefited from and acted in concert with bank personnel to interfere with Plaintiff's property rights, violated a state court injunction entered on December 20, 2024, misappropriated corporate assets, disseminated false narratives portraying the dividend as an "error," and unilaterally dissolved El Cartel Records, Inc. without shareholder approval, in violation of corporate law and fiduciary norms applicable to closely held corporations.

20. **Defendants John Doe 1–3 and Jane Doe 1–3** are attorneys who, upon information and belief, acted as legal representatives for Ramón Luis Ayala Rodríguez. Where proof presently exists, the Complaint alleges that the banks' legal divisions acted following communications involving Ayala and his counsel; where proof will be developed in discovery, Plaintiff alleges upon information and belief that these attorneys participated in meetings, communications, or coordination with the legal divisions of FirstBank and Oriental Bank that contributed to the decision to block, reverse, or restrict Plaintiff's funds. These defendants are sued in their personal and official capacities for their individual and concerted participation in the conduct underlying Counts I through XIV, including aiding and abetting and civil conspiracy.

21. **Defendant FirstBank Puerto Rico** is a federally insured depository institution chartered under the laws of the Commonwealth of Puerto Rico,

with principal offices in San Juan, Puerto Rico. FirstBank is supervised by the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau, and the Puerto Rico Office of the Commissioner of Financial Institutions, and is bound by the Federal Deposit Insurance Act, the Electronic Fund Transfer Act, Regulation E, the NACHA Operating Rules, and UCC Article 4A. As the Originating Depository Financial Institution for the dividend transfer at issue, FirstBank owed Plaintiff statutory, contractual, and fiduciary duties of accuracy, verification, lawful execution, and non-interference, and bore responsibility for the authenticity and legality of the payment orders it transmitted through the ACH network.

22. Upon information and belief, **FirstBank breached these duties** by issuing false indemnification agreements and fraudulent ACH reversal requests, deliberately mischaracterizing Plaintiff's authorized dividend as an "error" despite actual knowledge of its legitimacy. These acts constitute violations of EFTA §§ 1693c–1693h, including Section 907, Regulation E, UCC Article 4A, Puerto Rico tort law, and FirstBank's contractual obligations under its deposit and security procedures agreements.

23. **Defendant Irma Ramos** is a natural person domiciled in Puerto Rico who, at all relevant times, served as **Senior Vice President of Retail and Commercial Banking Operations** at FirstBank Puerto Rico. In that role, Ramos exercised high-level authority and oversight over

11

transaction integrity, ACH compliance, internal controls, and regulatory adherence. On December 12, 2024, Ramos executed four indemnification agreements falsely certifying that Plaintiff's lawful dividend transfers (on behalf of Los Cangris, Inc. and El Cartel Records, Inc.) were "operational errors," thereby triggering the wrongful R06 return process and directly causing the unauthorized withdrawal of Plaintiff's $50,000,000. Ramos is sued in her personal and official capacities for her knowing participation in the acts alleged across Counts I through XIV.

24. **Defendant Nitza Franco**, upon information and belief, is a Branch Manager and/or supervisory banking officer of FirstBank Puerto Rico. Franco participated in communications with Plaintiff and her sister Ayeisha Gonzalez regarding the reversal, facilitated the involvement of senior operations personnel, and failed to provide required notice or documentation to Plaintiff. Franco is sued in her personal and official capacities.

25. **Defendant Edwin Arroyo** is a natural person domiciled in Puerto Rico who, at all relevant times, served as **Chief of Operations** of FirstBank Puerto Rico. Arroyo supervised or participated in ACH processing, exception handling, reversal codes, and the operational execution of high-value transactions. On or about December 13, 2024 Plaintiff and her sister Ayeicha Gozález had a telephone conversation with Mr. Arroyo demanding the reasons regarding of the dividend reversal. (see paragraphs 83 and 84

12

of this Complaint, which provide a more detailed description of the conversation). Arroyo disclosed that the decision to reverse Plaintiff's funds was made by the legal divisions of FirstBank and Oriental Bank and confirmed the absence of any court order or written authorization. Arroyo is sued in his personal and official capacities for his role in executing, explaining, and failing to correct the unlawful reversal.

26. **Defendants John Doe 1–5 and Jane Doe 1–5** are attorneys and/or legal-division personnel of FirstBank Puerto Rico who, upon information and belief, authorized, approved, or directed the reversal of Plaintiff's funds and the imposition of account restrictions without lawful authority. They are sued in their personal and official capacities for their individual and concerted participation in the acts alleged across Counts I through XIV.

27. **Defendant Oriental Bank** is a federally insured financial institution organized under the laws of Puerto Rico, with principal offices in San Juan, Puerto Rico, and served as the Receiving Depository Financial Institution for the dividend transfer credited to Plaintiff's account. Oriental is subject to the Federal Deposit Insurance Act, the Electronic Fund Transfer Act, Regulation E, UCC Article 4A, the NACHA Operating Rules, and applicable OCIF regulations. As RDFI, Oriental owed Plaintiff statutory and contractual duties not to debit or reverse funds after acceptance of a valid payment order except where authorized by law or court order, and to investigate and reject unlawful ACH return requests.

28. Upon information and belief, Oriental violated these duties by honoring FirstBank's unauthorized R06 reversal request without inquiry, without Plaintiff's consent, and despite knowledge that the funds had been credited and settled. Oriental is further alleged to have acted in concert with FirstBank's legal division in authorizing the reversal and imposing account restrictions, thereby aiding and abetting the unlawful deprivation of Plaintiff's property.

29. **Defendants John Doe and Jane Doe**, upon information and belief, are Branch Managers, Chief Operations Officers, attorneys, legal-division personnel, and ACH or operations employees of Oriental Bank who participated in, approved, processed, or failed to prevent the reversal and account restrictions. They are sued in their personal and official capacities for their roles in the conduct alleged across Counts I through XIV.

30. **Defendant Insurance XYZ** is a fictitious designation for one or more insurers that, upon information and belief, issued professional liability, bankers' bonds, fidelity coverage, or directors-and-officers policies applicable to FirstBank, Oriental Bank, Irma Ramos, Edwin Arroyo, and other insured defendants. Pursuant to Puerto Rico's Direct Action Statute, 26 L.P.R.A. § 2003, Plaintiff is entitled to sue such insurers directly for all covered acts giving rise to the damages alleged herein.

31. **Defendants John Does 1–10 and Jane Does 1–10** are additional individuals whose identities are presently unknown but who, upon

14

information and belief, participated in, authorized, facilitated, concealed, or benefited from the wrongful acts alleged in this Complaint. Plaintiff will seek leave of Court to substitute their true names when discovered.

32.

## IV.  FACTUAL ALLEGATIONS

A.  **Corporate Structure, Governance, and Plaintiff's Executive Authority**

33.  Plaintiff Mireddys González Castellanos served at all relevant times as the President, primary executive officer, and fifty-percent shareholder of El Cartel Records, Inc. and Los Cangris, Inc., two closely held Puerto Rico corporations jointly owned by her and Defendant Ramón Luis Ayala Rodríguez. Since the inception of both corporations, González exercised managerial, operational, financial, and administrative authority, overseeing production, licensing, artistic development, contractual negotiations, and corporate governance. Her executive authority and equal ownership are fully reflected in the corporations' governing documents and repeatedly acknowledged by Defendants throughout their business dealings.

34.  FirstBank's records reflected copies of the applicable corporate resolutions of the El Cartel Records and Los Cangris as part of its "Security and Indemnity Procedures Agreement," which governed every ACH transaction, payment instruction, reversal, or account modification processed by FirstBank. That Agreement identified Mireddys González Castellanos and Ayeicha González Castellanos as the exclusive individuals

to whom FirstBank was required to place a verification call before acting on any instruction affecting corporate funds. Under the Agreement, FirstBank was prohibited from executing any debit, cancellation, transfer modification, or reversal unless it first verified authorization with one of the designated officers. Ramón Luis Ayala Rodríguez was never listed as an authorized signatory, was never designated as a person authorized to verify instructions, and was never permitted to issue or request transfers on behalf of either corporation..

35. Throughout the corporations' history, González and Ayeicha consistently executed all banking transactions, including deposits, transfers, reconciliations, payroll, vendor payments, and the routine distribution of royalties and revenues. FirstBank and Oriental Bank recognized this authority for years without dispute, following the dual structure in which corporate funds were safeguarded through the signatures and oversight of González and her sister. No document in either bank's records ever authorized Ayala to unilaterally transact, direct, reverse, or interfere with any corporate funds.

36. The corporate governance records maintained with the Puerto Rico Department of State for both El Cartel Records and Los Cangris further confirm González's standing as President and principal officer. Annual Reports filed in 2023 and 2024 list González as President, Secretary, and Treasurer for Los Cangris, and President for El Cartel. These filings carry the force of sworn certifications under Puerto Rico corporate law and were submitted without objection or correction by Ayala. Through these filings,

16

Ayala again acknowledged González's authority and the equal ownership structure of the companies.

37. Prior to December 2024, every major financial transaction for El Cartel and Los Cangris, including royalty receipts, touring revenues, merchandise settlements, distribution payments, and licensing disbursements, required the authorization of González or Ayeicha. Banking records maintained as part of the corporate files reveal no instance in which Ayala was recognized by any bank as an authorized signatory. This long-standing financial structure forms the backdrop against which the events of December 2024 occurred, and underscores the illegality of any banking action taken without González's knowledge or consent.

38. In addition to her formal authority, González was the foundational architect of the corporations' financial and operational success. From their inception, she managed the corporations' accounting infrastructure, retained financial professionals, coordinated multinational business relationships, and executed the business strategy that generated over $100 million in revenues. Her authority was not merely titular; it represented the essential management structure recognized by business partners, banks, accountants, and government agencies alike.

## B. Marital Separation, Retaliation, and Attempts to Seize Corporate Control

39. In August 2024, during a private discussion at the Hacienda Carabali, Luiquillo, González informed Ayala of her intention to pursue an amicable

notarial divorce and an equitable division of the marital and corporate estate. According to the factual allegations filed in the related state-court matters, Ayala immediately rejected the premise of equal ownership and equal rights to corporate funds. He responded that because he was "the Artist," he alone was entitled to control and possess all corporate earnings and bank accounts, notwithstanding the corporations' equal-share structure and González's decades-long executive management.

40. This exchange marked the beginning of a pattern in which Ayala attempted to undermine and override González's corporate authority. Between September and October 2024, Ayala and his representatives pressured González to execute new corporate resolutions granting him unilateral access to the corporations' bank accounts. On September 27, 2024, Ayala's accountant, Alejandra Piazza, emailed draft resolutions demanding that González authorize Ayala as a bank signatory for both El Cartel Records and Los Cangris. González refused, citing her fiduciary obligation to safeguard corporate funds from unilateral dissipation and her concern that Ayala would misuse corporate accounts to remove or conceal assets.

41. On October 3, 2024, Attorney Jos√© Antonio Pag√°n, acting on Ayala's behalf, sent a formal letter to Attorney Mar√≠a del Pilar P√©rez reiterating Ayala's demand for immediate financial control of the corporate bank accounts. The letter insisted that Gonz√°lez execute corporate resolutions

enabling Ayala to act as vice-president and authorized signatory. Crucially, however, the resolutions attached to Pag√°n's letter expressly name Gonz√°lez and Ayala as equal fifty-percent shareholders of El Cartel and Los Cangris. They also reaffirm Gonz√°lez's position as President and primary signatory, confirming that she was, at that very moment, the lawful executive officer whose authorization controlled all corporate banking authority. Ayala therefore cannot dispute her ownership or authority without contradicting his own attorney's written representations.

42. Ayala's efforts escalated when his daughter, Yamilette Ayala, appeared at a FirstBank branch and falsely asserted that González had already approved Ayala's addition as signatory. FirstBank personnel, upon reviewing their records and the bank's Security Procedure Agreement, determined that no such authorization existed and denied the request. This event is documented in the factual allegations submitted in state court and confirms that Ayala sought to gain control of the corporate accounts through misrepresentation rather than lawful corporate action.

43. Ayala's demands for unilateral control, his attempt to have his daughter misrepresent González's authorization at the bank, and the pressure applied through counsel demonstrate a coordinated effort to remove González from corporate financial authority, despite the legal, documentary, and historical reality that she remained the President,

19

primary executive officer, and controlling authorized signatory. These attempts laid the groundwork for the banking misconduct that followed in December 2024.

44.    By October 2024, the operational relationship between Plaintiff and Ayala had deteriorated due to Ayala's insistence on absolute control over funds that legally belonged to both shareholders. For more than twenty years, González had managed the corporations' affairs without interference, but Ayala's sudden insistence on unilateral control coincided with impending marital dissolution and the opening of separate dividend accounts at Oriental Bank. The timing reflects Ayala's intention to secure corporate liquidity for himself in anticipation of the marital property division.

45.    As these disputes escalated, González continued to exercise her lawful authority, managing corporate affairs and maintaining exclusive signatory control over the FirstBank and Oriental accounts in accordance with corporate resolutions, banking agreements, and Puerto Rico law. Ayala, lacking any signatory authority or banking credentials, could not lawfully direct, modify, or reverse any transaction, setting the stage for the unlawful ACH activity FirstBank executed the following month at Ayala's behest.

## C.    Creation of Separate Dividend Accounts and Prior Successful Dividend Distribution

46.    In October 2024, in anticipation of a structured and transparent division of marital and corporate property, González and Ayala—through counsel—

20

agreed to establish individual personal checking accounts at Oriental Bank for the exclusive purpose of receiving their respective corporate dividend distributions. This arrangement was designed to ensure clarity, accountability, and equal access to corporate earnings during the divorce process. The accounts were opened separately, not jointly, and were placed solely under the personal control of each shareholder in accordance with the corporate resolutions governing dividend distributions.

47. The parties also agreed that a modest dividend would be distributed immediately to facilitate living expenses and begin the process of equitable division. On October 16, 2024, El Cartel Records, Inc. declared a dividend of two million dollars, allocating one million dollars to each shareholder. FirstBank, acting as the Originating Depository Financial Institution (ODFI), executed the corresponding ACH credit transactions without incident. The funds were correctly credited to each of the shareholders designated individual Oriental Bank accounts, namely plaintiff González's individual account and Ayala's individual account. This successful transaction confirmed that the banks were able to process lawful dividend transfers securely, accurately, and in compliance with both corporate resolutions and banking regulations.

48. The October dividend distribution also reaffirmed González's exclusive authority over corporate financial operations. FirstBank recognized her instructions, validated her submitted resolutions, and processed the

21

transactions without seeking approval from Ayala or any other unauthorized party. The bank's adherence to the Security Procedure Agreement further demonstrated that, as of October 2024, there was no confusion or dispute regarding who held lawful signatory authority. This properly executed distribution is a material benchmark demonstrating that the corporations could carry out large transfers without issue, and that any later deviation from procedure was neither inadvertent nor the product of systemic error.

49. The parties' agreement to use separate personal accounts for dividends was also intended to maintain corporate integrity and prevent the commingling of funds. González and Ayala, as equal shareholders, were each entitled to half of any distribution approved by the Boards of Directors. The creation of separate accounts further ensured that each shareholder's share of corporate earnings could be independently tracked, controlled, and regulated, thereby minimizing the potential for disputes or allegations of mismanagement.

50. By late October 2024, both shareholders' personal dividend accounts were fully operational, accurately recorded in the corporate banking instructions, and designated in the December dividend resolutions as the accounts to receive the much larger distributions that would later be declared. FirstBank and Oriental Bank had already recognized these accounts in the context of the October dividend, thereby eliminating any

22

possibility that they were unaware of the accounts' ownership, purpose, or status when processing the December transfers.

51. The October dividend distribution also demonstrated that FirstBank possessed full and correct documentation of the signatory structure, corporate authority, and designated accounts for shareholder distributions. The bank had verified and executed those distributions in compliance with internal policies and external regulations, confirming that the financial institutions had no operational difficulty processing large transfers in accordance with Plaintiff's lawful instructions. This history directly contradicts any later claim by Defendants that the December transactions were unauthorized, erroneous, suspicious, or fraudulent.

52. The successful October distribution provides essential context for understanding the December 2024 events. It establishes a baseline of routine, lawful, properly documented ACH transfers executed under González's authority, without objection, hesitation, or questions from either bank or Ayala. It further proves that the banks had already processed an identical type of transaction, into the exact same destination accounts, for the exact same shareholders, under the exact same corporate structure, rendering any subsequent attempt to recharacterize the December transfers as "errors" or "unauthorized" facially inconsistent with established corporate banking practice.

## D.  December 2024 Declaration of the $100 Million Dividend.

23

53. By early December 2024, the corporations had accumulated substantial retained earnings stemming from decades of successful international touring, publishing revenues, licensing arrangements, digital distribution agreements, merchandising, sponsorships, and the global commercial exploits built under González's leadership. Following the deterioration of the marital relationship and the unilateral withdrawal by Ayala of the entire balance of approximately six hundred thousand dollars from the parties' joint Oriental Bank account on December 2, 2024, González consulted her legal and accounting team to determine the appropriate path to secure both shareholders' interests and prevent further unilateral dissipation of corporate resources.

54. González sought guidance from her attorneys María del Pilar Rojas, CPA-attorney Hipólito Torres Rivera, attorney David Carrión Barlat, and certified public accountant and tax professional José Vicente García. These professionals reviewed corporate financials, verified retained earnings, evaluated tax implications, and confirmed the legality and prudence of a dividend distribution in accordance with Puerto Rico's General Corporations Act and applicable tax laws. The professionals unanimously concluded that a dividend totaling one hundred million dollars—eighty million dollars from El Cartel Records and twenty million dollars from Los Cangris—could lawfully be declared to protect both shareholders' interests while the divorce proceeded.

55. On December 8, 2024, acting under González's presidency and with corporate counsel's assistance, both corporations approved and executed formal Board Resolutions declaring the one hundred million–dollar dividend. The resolutions specified that the funds were to be divided equally between the two shareholders, with fifty million dollars to be deposited into Plaintiff's personal Oriental Bank account and fifty million dollars into Ayala's personal Oriental Bank account. The resolutions were duly signed, notarized, sealed, and transmitted to FirstBank, El Cartel's and Los Cangris' primary depository institution, along with corporate minutes and documentary support reflecting compliance with corporate procedures.

56. The dividend resolutions explicitly identified the destination accounts, the amounts allocated to each shareholder, the corporate authority approving the distributions and the signatures of the authorized members of the Board of Directors. The documentation left no ambiguity as to the purpose, intent, or authority underlying the dividend declaration. FirstBank was therefore fully on notice that the distributions were intentional, lawful, and executed under the express authority of González and Ayeicha—its only authorized signatories and members of the Board of Directors.

57. At the time the dividend was declared, Ayala possessed no signatory authority over any corporate account at FirstBank or Oriental Bank, nor did any corporate resolution grant him such authority.

25

58. The corporate resolutions transmitted to FirstBank on December 8, 2024 also reflected the uninterrupted management authority González had exercised for decades. They reaffirmed the Board-approved dividend, directed FirstBank to carry out the distribution in accordance with standard ACH protocols, and provided all necessary supporting documentation. FirstBank received the documents without objection, verified the corporate resolution format it had previously relied on for the October distribution, and processed the instructions through its internal high-value transaction channels.

59. The dividend declaration was neither unusual nor irregular given the corporations' financial posture. El Cartel and Los Cangris had historically maintained high-value revenues, and distributions to shareholders—especially equal ones reflecting the fifty-percent ownership structure of each shareholder—were consistent with the business and tax practices of closely held entertainment companies. Nothing in the dividend resolutions or supporting documentation suggested any impropriety, and the banks had previously processed analogous distributions without issue.

60. The declared dividend represented the lawful exercise of corporate powers by the Boards of Directors of El Cartel and Los Cangris. It was conducted with professional oversight, full documentation, proper notice to the corporations' depository bank, and equal treatment of both shareholders. The record of Board approval, the banks' knowledge of the designated

accounts, and the accuracy of prior transfers all underscored the legitimacy of the dividend and FirstBank's corresponding obligation to execute it without interference or deviation.

### E. Execution of the December 10–11 ACH Transfers

61. On December 10 and 11, 2024, acting pursuant to the valid resolutions transmitted by González and Ayeicha, FirstBank Puerto Rico initiated and executed the four high-value ACH credit transfers comprising the one hundred million-dollar dividend distribution. These transfers followed the same corporate protocols and banking procedures used for the earlier October dividend, and FirstBank processed each transaction as a lawful, intentional, authorized funds transfer under UCC Article 4A and NACHA Operating Rules. At all material times, FirstBank possessed full documentation confirming the identities, signatory authority, and designated accounts of both shareholders.

62. FirstBank's internal ACH system generated and transmitted the payment orders exactly as instructed. The funds originated from the corporate accounts of El Cartel Records and Los Cangris and were credited to the designated personal Oriental Bank accounts maintained by González and Ayala. The transactions were electronically stamped with the descriptor "Distribución de Dividendos Exentos," thereby identifying the transfers as corporate dividend distributions rather than operational payments or non-routine disbursements.

27

63. On December 11, 2024, the transfers settled fully. Plaintiff received forty million dollars from El Cartel and ten million dollars from Los Cangris, for a total of fifty million dollars. Ayala received the same. At that moment, under UCC Article 4A-406 and Article 4A-209, each credit became a completed, irrevocable payment order, and title to the transferred funds vested in the receiving account holder. Plaintiff's Oriental account reflected the full fifty million dollars.

64. Indeed, Ayala's federal complaint, filed in Case No. 3:25-cv-01399, attaches FirstBank's "Completed Transaction Details" for all four dividend payments. These documents appear at pages 7 and 8 of his complaint and reflect that each ACH transfer was processed, completed, and credited without error or irregularity. The attached screenshots include FirstBank-issued confirmation numbers, timestamps, and settlement indicators required by NACHA's Record Format specifications. Ayala voluntarily submitted these documents in federal court, thereby authenticating their accuracy and conceding the legitimacy of the December 10–11 transfers.

65. The ACH confirmations attached to Ayala's complaint eliminate any plausible dispute concerning the validity of the transfers. They reflect no anomaly, no duplicate entry, no miscode, no reversal flag, and no corrective notation of any kind. Each transaction appears as a completed posting from the FirstBank ODFI to Oriental's RDFI system, meaning that FirstBank's ACH department concluded the standard authentication and authorization

28

checks associated with high-value originations. The banks therefore acted in conformance with ordinary ACH processing at the time of execution.

66. Neither FirstBank nor Oriental questioned the authenticity of the corporate resolutions, the identity of the authorized officers, or the purpose of the dividend distribution. FirstBank did not contact González or Ayeicha to raise concerns regarding authorization or legitimacy. No fraud alert was triggered, no hold was placed on the funds, and no internal review was initiated. Instead, FirstBank processed the dividend with the same certainty and procedural compliance as it had with the October distribution, demonstrating that the bank had full confidence in both the corporately authorized instructions and Plaintiff's signatory authority.

67. By the end of the day on December 11, 2024, the one hundred million dollars had been lawfully transferred out of the corporate accounts and deposited into the personal accounts of the two equal shareholders in equal shares. FirstBank had fulfilled its legal obligation as the ODFI, the funds had become the personal property of the receiving account holders, and the corporations had executed a lawful dividend consistent with corporate law, tax law, and the companies' financial capacity.

68. These completed transfers, validated by FirstBank's own system and Ayala's own exhibits, form the legal baseline for evaluating all subsequent conduct. Any later claim that these transfers were "errors" or "unauthorized" contradicts both the contemporaneous banking records and

Ayala's sworn federal submissions. At the moment the funds settled, Plaintiff had acquired full legal entitlement to fifty million dollars, protected under EFTA, NACHA rules, UCC Article 4A, and FirstBank's contractual obligations.

## F. The December 12, 2024 Unauthorized and Fraudulent ACH Reversal

69. Less than twenty-four hours after the dividend transfers settled and were fully credited to Plaintiff's personal Oriental Bank account, Plaintiff's $50,000,000 dividend was reversed and removed through the ACH system. Upon information and belief, in the interval between the lawful settlement of the dividend transfers and the initiation of the return process, Defendant Ramón Luis Ayala Rodríguez and a group of his legal representatives communicated with, met with, or otherwise coordinated with attorneys and personnel within the Legal Division of FirstBank Puerto Rico regarding how to effectuate the return of the $50,000,000 dividend credited to Plaintiff. In those communications, Ayala and his counsel, upon information and belief, falsely portrayed the dividend as unauthorized or improper and asserted that Plaintiff lacked authority to receive the funds absent Ayala's approval, advancing the claim that the money had been wrongfully taken and needed to be returned immediately, despite Ayala lacking signatory authority and despite the dividend having been lawfully executed pursuant to corporate resolutions.

70. Upon information and belief, following those communications, FirstBank's Legal Division contacted and coordinated with the Legal Division of Oriental Bank and demanded cooperation in reversing the already credited transfer. Upon information and belief, the banks' legal divisions aligned on a course of action to undo the settled ACH credit by characterizing the transaction as an alleged "error" and using that characterization as the procedural basis for an ODFI-initiated return, notwithstanding that reversing a completed ACH credit without beneficiary authorization, without a court order, and without a lawful error basis is prohibited by federal banking law, industry operating rules, and the banks' own contractual safeguards.

71. After this alignment, and upon information and belief, the Legal Divisions of FirstBank and Oriental caused internal instructions to be issued to their respective line personnel responsible for ACH operations and high-value transaction handling. At FirstBank, those instructions were implemented through Retail and Commercial Banking Operations under the authority of Irma Ramos, Senior Vice President of Retail and Commercial Banking Operations, together with supervisory and operational staff responsible for ACH exception handling. At Oriental Bank, upon information and belief, supervisory, operations, and ACH personnel, including branch-level and operations leadership presently unidentified, were instructed to accept and process the return once transmitted through the ACH network.

31

72. On December 12, 2024, acting within the scope of her role at FirstBank, Irma Ramos operationalized the reversal by preparing and executing four documents titled "Indemnity Agreement / Request for Return of Funds from ACH Transaction." Each document asserted that the dividend transfers credited on December 11 were "ACH errors" requiring reversal. Those assertions were false because the transfers were not erroneous, had been properly authorized, and had been executed pursuant to valid corporate resolutions on file with FirstBank. Upon information and belief, Ramos executed these documents to create the procedural predicate necessary to initiate an R06 return through the ACH system and to enable the reversal of a fully credited transfer.

73. In executing the return documentation and initiating the ACH return, Ramos acted pursuant to internal legal instruction and without obtaining any written authorization from Plaintiff, without receiving any customer-initiated claim of error, and without performing the mandatory call-back verification required under FirstBank's Security Procedure Agreement. By virtue of her position overseeing transaction integrity and ACH compliance, Ramos knew or was required to know that reversing a settled ACH credit without beneficiary consent, a judicial order, or a documented lawful error violates the Electronic Fund Transfer Act, Regulation E, UCC Article 4A, and the NACHA Operating Rules. Nevertheless, she certified the transactions as "errors" and initiated the return process.

74. Upon information and belief, after the return requests were executed, FirstBank's ACH operations staff processed the R06 return under the supervision or authority of Edwin Arroyo, Chief of Operations. In that capacity, Arroyo oversaw or facilitated the internal classification, routing, and operational handling of ACH exception items, including the processing of ODFI-initiated returns. Although the decision to reverse was described as originating from the banks' legal divisions, Arroyo's role encompassed ensuring that any return submitted through the ACH network complied with governing rules and security procedures. Upon information and belief, Arroyo and operations staff processed the return despite the absence of beneficiary authorization, the absence of a court order, and the fact that the transfer had already been credited and settled.

75. Upon information and belief, Nitza Franco, acting in her capacity as a Branch Manager and/or supervisory banking officer at FirstBank, was aware that Plaintiff was the account holder affected by the reversal and that a transaction of extraordinary magnitude was being undone. Franco did not notify Plaintiff of the impending reversal, did not verify authorization with Plaintiff, and did not escalate the matter to require customer confirmation before the funds were removed. By failing to provide notice or verification in connection with a high-value reversal, Franco departed from standard customer-protection and verification practices and contributed to the execution of the reversal without Plaintiff's knowledge.

76. Upon information and belief, Oriental Bank, acting as the Receiving Depository Financial Institution, received the R06 return request from FirstBank and processed the return through its supervisory, operations, and ACH personnel. These personnel accepted the ODFI-initiated return and debited Plaintiff's personal account, returning the funds to FirstBank. Upon information and belief, Oriental personnel processed the return without demanding supporting documentation demonstrating a lawful error, without notifying Plaintiff prior to the debit, and without independently verifying that the return complied with the rules governing reversals of settled ACH credits, despite the funds having already been credited to Plaintiff's account.

77. The combined actions of the Legal Divisions of FirstBank and Oriental, acting in concert with the legal representatives of Ramón Luis Ayala Rodríguez, and the subsequent actions of FirstBank's executive, supervisory, and operational personnel and Oriental Bank's supervisory and ACH personnel, converted an internal legal determination into an executed ACH reversal. The process moved from legal coordination, to executive certification, to operational processing, to ACH transmission, and finally to debit and return, with each stage relying on internal directives rather than on a lawful customer-initiated dispute, a documented error, or a court order.

78. Throughout this process, the individuals involved occupied positions that required familiarity with the statutory and regulatory framework governing electronic funds transfers. By virtue of their roles, they knew or were charged with knowing that a completed ACH credit may not be reversed absent beneficiary authorization, a valid error determination following required procedures, or judicial authorization. Notwithstanding that knowledge, the reversal was executed through internal instruction, resulting in the removal of Plaintiff's $50,000,000 from her account and the deprivation of her personal financial property.

79. The actions of the Legal Divisions of FirstBank and Oriental, acting in concert with Ayala's legal representatives, to induce and direct bank employees to carry out the reversal through mischaracterization of a lawful dividend as an "error," constituted the use of improper and abusive methods to deprive Plaintiff of her property. Internal legal instruction was used to cause line employees to execute a transaction that violated established bank rules, federal statutes, industry operating requirements, and contractual security procedures. The December 12, 2024 reversal therefore was not the product of lawful banking practice, but the result of coordinated, unauthorized conduct that directly caused Plaintiff's loss and set in motion the subsequent events alleged in this Complaint.

## G. December 13, 2024: Plaintiff's Discovery of the Missing Funds and FirstBank's Direct Admissions of Wrongdoing

35

80. On the morning of December 13, 2024, at approximately 9:35 a.m., Plaintiff Mireddys González discovered that the $50,000,000 dividend that had been credited to her personal Oriental Bank account the previous evening had been removed in its entirety. The funds had appeared as posted and available on December 11, 2024, yet by the next morning the account balance reflected a complete reversal. Plaintiff had received no advance notice, no written communication, no electronic alert, and no documentation from either FirstBank Puerto Rico or Oriental Bank explaining any hold, dispute, error, or reversal affecting her account. Alarmed by the unexplained disappearance of a fully settled transfer, Plaintiff immediately sought clarification from the bank.

81. Acting at Plaintiff's direction, her sister, Ayeisha González, placed a telephone call at approximately 9:45 a.m. from her personal mobile phone, number (787) 512-5355, to the personal cellular phone of FirstBank officer Nitza Franco, number (787) 548-1751. The call was placed on speakerphone, and Plaintiff was physically present throughout the conversation, actively listening and directing the questions posed to the bank representatives. The call therefore constituted a direct customer inquiry by Plaintiff into the handling of her funds.

82. During the call, Franco added Edwin Arroyo, who identified himself as being from FirstBank's operations and who addressed questions concerning the status of the accounts and the reversal. Arroyo explained

36

that because there were two owners involved in litigation, the bank's position was that the relevant corporate accounts would be treated as "credit only" and that no distributions should occur until a court issued a resolution. When asked what document or court order FirstBank had received authorizing it to stop, undo, or reverse a transaction that had already been executed and credited, Arroyo did not identify any judicial mandate. Instead, he referenced that the bank had documentation indicating that Ayala was an owner and could raise a claim, even though he did not sign on the account, and reiterated that the bank would not proceed until there was a court resolution.

83. When pressed further to identify any legal document supporting the determination to reverse or restrict the transaction, Arroyo stated that no such document had been received and described the basis for the bank's actions as "recommendations." In the same conversation, Arroyo stated that the determinations affecting the transaction were made by "the legal division of us with the legal division of Oriental," and later reiterated that it was "the legal division of FirstBank with the legal division of Oriental" that addressed the matter. These statements, as recorded, reflect that the reversal and related restrictions were not described as the result of a court order or an automated banking process, but rather as internal determinations made by the legal divisions of both banks acting together.

84. Throughout the call, Plaintiff sought to understand why her funds had been reversed and why she had not been notified. Ayeisha informed Arroyo that she learned of the reversal because Oriental Bank communicated it to her, not because FirstBank provided notice. When asked why Plaintiff had not been contacted before reversing a transaction of that magnitude, Arroyo did not indicate that any prior notice had been given and instead suggested that Plaintiff should "speak with the lawyers," again referring to the banks' legal departments. Arroyo also acknowledged during the call that the funds had been received by Oriental Bank, while stating that they were "not credited," even as Plaintiff stated that she had personally observed the funds posted to her account before their removal. The exchange reflects that Plaintiff understood the funds had been credited and settled prior to the reversal.

85. When asked whether a specific person had decided that the funds were going to be reversed, particularly given the absence of any document requiring reversal, Arroyo stated that he did not have that detail but reaffirmed that the determination came from the legal divisions of both banks. Taken as stated, these remarks establish that the decision to prevent distribution and to reverse the funds was not attributed to an operational error, not initiated by Plaintiff, and not ordered by any court, but was internally directed by the legal departments of FirstBank and Oriental Bank.

86. Although Plaintiff did not cite statutes, regulations, or industry rules during the call, the substance of the conversation demonstrates that the actions taken departed from the standard framework governing electronic funds transfers. The facts disclosed during the call include the absence of any court order, the absence of any disclosed written authority, the absence of customer notification, the reversal of a fully settled ACH transaction, and the description of the decision as an internal legal determination. These circumstances are inconsistent with the procedures required for reversing a completed electronic funds transfer, including requirements for authorization verification, documentation of debits and returns, and lawful predicates for cancellation of accepted payment orders.

87. The conversation further reflects that Plaintiff requested the basic information that banking rules require to justify reversing a settled transfer, including the reason for the reversal, the authority relied upon, and why the customer was not notified. The bank did not provide a court order, did not identify any written authorization, and did not point to a documented error investigation. Instead, Plaintiff was told that the determination was made by the banks' legal divisions and that she would need to address the matter with counsel. The recorded call therefore constitutes factual evidence that Plaintiff's funds were removed through an internally orchestrated action rather than through a lawful customer-dispute or error-resolution process.

39

88. The December 13, 2024 call represents the first recorded disclosure to Plaintiff that the reversal and related restrictions were being treated as legal-division determinations rather than as court-ordered or error-driven actions, and that Plaintiff had not been provided the ordinary notices or documentation that would accompany a lawful reversal of a transfer of that magnitude. The call thus serves as central factual evidence of the manner in which the banks handled the reversal, the absence of judicial or statutory authorization at the time of execution, and the procedural deficiencies that form the basis of Plaintiff's federal and Puerto Rico law claims.

89. The December 13, 2024 conversation also constituted, in substance and effect, a beneficiary dispute and implied return challenge that triggered the obligations imposed on ACH participants to review, investigate, and correct an improper return. During the call, Plaintiff—through direct questioning and demands for explanation—placed FirstBank on notice that the reversal lacked authorization, lacked a documented error basis, and lacked judicial authority, and she requested the information and justification required to support a lawful ACH return. Those inquiries afforded FirstBank and Oriental Bank the opportunity to pause the process, conduct a full investigation, request and evaluate supporting documentation, and reverse the return by restoring the funds to Plaintiff's account if the return proved improper. Instead of initiating any corrective

review, requesting additional information, or invoking any error-resolution or dispute-handling procedures, FirstBank's representatives stated that the matter had already been decided by the banks' legal divisions and that the action was being carried out pursuant to internal legal determinations. By characterizing the reversal as final and legally directed, and by advising Plaintiff that she should address the issue with lawyers rather than through banking processes, the banks conveyed that no investigation would be conducted and no corrective action would be taken. The refusal to review, investigate, or correct the return after Plaintiff's inquiries reflects a conscious decision to rely on internal legal instruction in lieu of the remedial and investigatory steps required of ACH participants when a beneficiary challenges the validity of a return, and it further evidences that the banks elected not to comply with the banking rules governing dispute resolution and correction of improper ACH transactions.

## H. December 20, 2024 Judicial Freeze Order and Defendants' Deliberate Defiance

90. Following the unauthorized reversal of Plaintiff's $50,000,000 dividend on December 12, 2024, the disputes between Plaintiff and Defendant Ramón Luis Ayala Rodríguez intensified and became the subject of active judicial proceedings in the Commonwealth of Puerto Rico. As a result of those proceedings, and in order to preserve corporate assets pending adjudication, the Puerto Rico Court of First Instance, San Juan Part, issued a judicial freeze order on December 20, 2024, embodied in a

stipulated judgment. The order expressly prohibited any transaction exceeding one hundred thousand dollars ($100,000) from the corporate accounts of El Cartel Records, Inc. and Los Cangris, Inc. unless both shareholders jointly authorized the transaction, and further required that approximately seventy-five million dollars in remaining corporate funds remain untouched for a period of thirty days. The injunction was mandatory, clear in its terms, and immediately enforceable upon issuance.

91. On the same day the order was entered, Plaintiff promptly notified both FirstBank Puerto Rico and Oriental Bank of the freeze order. Plaintiff transmitted copies of the judgment to FirstBank officer Nitza Franco and to Oriental Bank officer Zoe Matos and expressly instructed both institutions that no transaction exceeding the $100,000 threshold could be processed without her joint authorization together with Ayala. Both banks acknowledged receipt of the judicial order and therefore had actual knowledge that the corporate accounts were subject to judicial restriction and heightened legal protection.

92. Despite having actual notice of the freeze order and despite their clear obligations as custodians of the corporate accounts, Defendants did not take steps to implement the restrictions mandated by the court. Neither FirstBank nor Oriental placed effective holds on the accounts, escalated the matter for compliance review, or ensured that dual-authorization controls were enforced. Instead, both institutions continued to process,

42

facilitate, or allow high-value transactions affecting the corporate funds based solely on unilateral instructions from Ayala, without seeking Plaintiff's approval and without performing the verification procedures required under the court order and under their own internal controls.

93. Between December 20, 2024 and January 2025, substantial corporate funds continued to be transferred, consolidated, or repositioned into accounts under Ayala's exclusive control through banking activity involving FirstBank and Oriental Bank. These transactions exceeded the monetary threshold established by the court, were not jointly authorized by Plaintiff, and were processed notwithstanding the express prohibition contained in the judicial order. At no point did either bank contact Plaintiff to request authorization, confirm compliance with the injunction, or notify her of the transactions being executed.

94. The banks' conduct during this period demonstrates that, having already relied on internal legal determinations to reverse Plaintiff's personal dividend, they again elected to rely on Ayala's unilateral instructions rather than on judicial authority. Their failure to comply with the freeze order was not the result of misunderstanding or clerical oversight, but reflected a continuation of the same course of conduct that began with the December 12 reversal—namely, prioritizing Ayala's demands over Plaintiff's rights and over binding legal restrictions.

95. By facilitating transactions in violation of the judicial freeze order, FirstBank and Oriental knowingly exposed corporate assets to dissipation and deprived Plaintiff of the protections the court had put in place to preserve parity between the shareholders. Their actions undermined the purpose of the injunction, impaired Plaintiff's ability to safeguard her ownership interest, and enabled Ayala to consolidate control over corporate funds while excluding Plaintiff from the decision-making process to which she was legally entitled.

96. This deliberate defiance of a clear and enforceable court order constitutes an independent and aggravating breach of the banks' statutory, contractual, and common-law duties. It also demonstrates a pattern of coordinated conduct between Ayala and the financial institutions, in which judicial authority, regulatory obligations, and internal safeguards were disregarded in favor of unilateral action. The violations of the freeze order form a critical component of Plaintiff's damages and further establish the banks' and Ayala's joint responsibility for the ongoing deprivation and misappropriation of corporate assets that followed.

## I. Ayala's Judicial Admissions and Contradictory Statements Establishing His Direct Role in the Unauthorized Reversal

97. In the weeks following the unauthorized removal of Plaintiff's dividend funds, information began to surface demonstrating that the reversal had not been initiated by any banking error, nor through any procedure

44

recognized by EFTA, NACHA, or UCC Article 4A. Plaintiff later learned, through Ayala's own federal litigation filings and public statements made by his counsel, that Ayala had personally intervened with FirstBank to cause the reversal of Plaintiff's fifty million-dollar dividend. This admission dismantles any possible assertion that the banks acted independently or in accordance with lawful banking procedure.

98. In Ayala's federal complaint filed in the United States District Court for the District of Puerto Rico, Case No. 3:25-cv-01399, Ayala explicitly alleges that "through swift intervention by Ayala-Rodríguez, the transactions transferring the funds were reversed before the funds were lost." This statement appears plainly in paragraph 27 of his pleading. It constitutes a binding judicial admission that Ayala either instructed, pressured, influenced, or otherwise caused FirstBank to reverse Plaintiff's funds and that the bank complied with his demands despite his total lack of signatory authority, corporate authority, or legal standing to alter or cancel any corporate transaction.

99. This admission also confirms that the reversal was not caused by any purported "ACH error," nor by any concern on the part of the bank related to fraud or misdirection. Rather, it was executed solely because Ayala viewed Plaintiff's lawful receipt of her fifty million dollars as a financial "loss" to him and intervened to undo the transaction. The language of his pleading—suggesting that the reversal prevented the funds from being

45

"lost"—reveals that Ayala perceived Plaintiff's rightful share as money he wished to retain or recover for himself, exposing both motive and intent.

100. Ayala's judicial admission also contradicts his own accusations in paragraph 26 of the same complaint, where he falsely claims that Plaintiff engaged in a "brazen and unauthorized transfer of $100 million." Pages 7 and 8 of his filing attach the ACH confirmations for all four dividend transactions, each labeled by FirstBank as completed and authorized. These documents, which Ayala voluntarily submitted, verify that Plaintiff received the same amount as Ayala, that both transfers were processed lawfully, and that the corporate resolutions authorizing them were valid. Ayala's simultaneous claim of unauthorized conduct is therefore demonstrably false and internally inconsistent.

101. Ayala's admission that he caused the reverse transfer, coupled with his attempt to portray Plaintiff's lawful receipt of her equal dividend as improper, exposes not only the falsity of his allegations but also the retaliatory motive underlying his actions. His assertion that Plaintiff's share of corporate funds represented a "loss" to him demonstrates that his intervention was intended to deprive her of her lawful property rights rather than to correct any banking irregularity.

102. This combination of admissions—his acknowledgment of intervention, his mischaracterization of Plaintiff's lawful funds as a loss, his refusal to reverse his own dividend, and his submission of documents proving the

46

validity of all four ACH transfers—forms incontrovertible evidence that the reversal was neither authorized nor grounded in banking error. Instead, it was the product of a coordinated scheme between Ayala and FirstBank to deprive Plaintiff of fifty million dollars in corporate dividends to which she was legally entitled.

## J. Ayala's January 10, 2025 Withdrawal of $118 Million and His Admission That He Knew the Location of the "Missing" Funds

103. The pattern of conduct initiated by the unauthorized reversal of Plaintiff's $50,000,000 dividend on December 12, 2024 escalated materially in the weeks that followed. On January 10, 2025, Defendant Ramón Luis Ayala Rodríguez personally withdrew approximately $118,000,000 from a FirstBank corporate account belonging to El Cartel Records, Inc. This withdrawal was disclosed by Ayala in sworn filings submitted in the related proceedings before the Puerto Rico Court of First Instance and is corroborated by banking records obtained by Plaintiff and preserved in the project file. The withdrawal occurred after the reversal of Plaintiff's dividend and during the pendency of ongoing disputes concerning the ownership and control of corporate assets.

104. Ayala's January 10 withdrawal was executed without Plaintiff's knowledge, consent, or authorization, despite Plaintiff's undisputed status as a fifty-percent shareholder and co-owner of the corporations and her continuing entitlement to participate in all decisions affecting corporate

47

funds. No joint authorization was obtained from Plaintiff, as required by the corporations' governing documents and by a binding judgment of the Puerto Rico Court of First Instance, which expressly prohibited the removal or transfer of corporate funds in excess of $100,000 without the prior consent of both shareholders. Ayala's unilateral withdrawal therefore violated the court's order, departed from the corporations' governance requirements, and constituted a knowing breach of the fiduciary duties of loyalty, good faith, and fair dealing owed by Ayala to Plaintiff as an equal co-owner in a closely held corporation.

105. In the same sworn submissions in which Ayala acknowledged withdrawing the $118,000,000, he also stated that he knew the location of the funds he elsewhere described as "missing," including a sum of approximately $46,000,000. Ayala represented that those funds were located in the same FirstBank corporate account from which he later withdrew the $118,000,000. This admission directly contradicts public and judicial assertions that corporate funds had been lost, misappropriated, or diverted by Plaintiff. Instead, Ayala's own statements establish that he had continuous knowledge of the location of the corporate funds and access to the accounts in which they were held.

106. Ayala's acknowledgment that he knew where the funds were located is significant because it undermines any claim that the December 12 reversal of Plaintiff's dividend was motivated by concern over missing or

endangered assets. If Ayala knew that the funds were present in a corporate account under his control, there was no factual basis to characterize Plaintiff's lawful dividend as an improper transfer or to seek its reversal. His admission therefore reinforces the inference that the reversal was not a protective banking measure but an act undertaken to prevent Plaintiff from retaining her share of corporate liquidity.

107. The timing and sequence of Ayala's actions further support this conclusion. After causing or influencing the reversal of Plaintiff's $50,000,000 dividend, Ayala proceeded to withdraw the remaining corporate funds, consolidating control over virtually all liquid assets of the corporations. This sequence of events reflects a deliberate course of conduct in which Plaintiff was first deprived of her dividend and then excluded from access to the remaining corporate funds, resulting in a profound imbalance between the shareholders and the effective elimination of Plaintiff's financial parity.

108. Ayala's January 10 withdrawal also had immediate and substantial consequences for the corporations. By removing $118,000,000 in corporate funds without joint authorization, Ayala depleted the corporations' liquidity, impaired their ability to meet obligations, and deprived Plaintiff of her right to one-half of the retained earnings. The withdrawal exposed the corporations to operational risk and undermined the financial stability that Plaintiff had managed for years.

109. Taken together, Ayala's admission that he withdrew $118,000,000, his acknowledgment that he knew the location of the allegedly "missing" funds, and the absence of any authorization or corporate approval for the withdrawal establish that his conduct was not inadvertent or defensive. Rather, these facts support the conclusion that Ayala acted with knowledge and intent to consolidate exclusive control over corporate assets while Plaintiff was deprived of her lawful share. The January 10, 2025 withdrawal thus represents a continuation and escalation of the same course of conduct that began with the December 12, 2024 reversal and forms a central component of the damages and liability alleged in this action.

## K.  Ayala's Illegal Dissolution of El Cartel Records and Misappropriation of Corporate Assets

110. After orchestrating the unauthorized reversal of Plaintiff's fifty-million-dollar dividend and unilaterally withdrawing one hundred eighteen million dollars in remaining corporate funds, Ayala took the unprecedented step of dissolving El Cartel Records, Inc. without any notice to Plaintiff, without convening a shareholder meeting, and without obtaining the required consent of the fifty-percent co-owner and President of the corporation. On April 21, 2025, Ayala executed dissolution documents purporting to terminate the existence of El Cartel Records, Inc. These documents were filed with the Puerto Rico Department of State on April 23, 2025, as reflected in the certified dissolution records included in the project archive.

50

111. The dissolution was carried out in blatant violation of the Puerto Rico General Corporations Act. Under the Act, dissolution of a corporation with shares having voting rights requires either a meeting of shareholders with proper notice and majority approval or the written consent of all shareholders entitled to vote. Plaintiff, as a fifty-percent owner and a statutory fiduciary officer, did not receive any notice of a shareholder meeting, did not consent to dissolution, and did not participate in any corporate process authorizing such dissolution. Ayala therefore acted ultra vires, without authority, and in direct violation of the statutory framework governing corporate governance in Puerto Rico.

112. In addition to violating statutory requirements, Ayala's dissolution contravened the corporations' internal governance documents, which require formal action by the Board of Directors and approval by both shareholders for any action involving liquidation, transfer of substantially all assets, or cessation of business. At the time of the purported dissolution, the Board of Directors of El Cartel Records had not convened, had not adopted or issued any resolution authorizing dissolution, and had not provided notice of any intent to dissolve the corporation. Likewise, Plaintiff, as a fifty-percent shareholder, did not consent to or approve any dissolution or liquidation. The purported dissolution was therefore null and void ab initio because it lacked the required board action and the

51

mandatory approval of both shareholders, and was undertaken without procedural legitimacy or substantive authority.

113. Following the unlawful dissolution, Ayala transferred the entirety of El Cartel's remaining assets—including music masters, trademark portfolios, digital distribution agreements, merchandise catalogues, touring rights, licensing contracts, and valuable goodwill—to himself personally or to entities under his exclusive control. These assets were the product of more than two decades of corporate development managed by Plaintiff, and they constituted some of the most commercially significant intellectual property in the Latin music industry.

114. The transfer of these assets occurred without any valuation, without any compensation to Plaintiff, and without adherence to statutory liquidation requirements. Under Puerto Rico law, upon dissolution, corporate assets must be used first to satisfy debts and obligations, and any remaining value must be distributed to shareholders on a pro rata basis according to their ownership interests. Ayala disregarded these requirements entirely, appropriating the entire value of the corporation—including Plaintiff's fifty-percent share—without notice, without negotiation, and without judicial oversight.

115. The dissolution also facilitated Ayala's ongoing concealment of corporate records, revenues, and contracts. By purporting to terminate the corporation and transferring its assets to privately held entities, Ayala

effectively shielded operational revenues, digital streaming payouts, royalties, and future earnings from Plaintiff, denying her access to financial transparency required under corporate law. This conduct further obstructed Plaintiff's ability to evaluate the corporation's financial condition, enforce her shareholder rights, or assert claims over misappropriated corporate assets.

116. Ayala's dissolution maneuvers also stood in direct tension with his own litigation posture. While he publicly accused Plaintiff of causing "chaos" within the corporations and invoked alleged concerns regarding corporate governance, he simultaneously engaged in unauthorized withdrawals, violations of judicial orders, and unilateral dissolution—all actions inconsistent with good-faith corporate stewardship and indicative of orchestrated financial seizure.

117. The illegal dissolution was not merely a closing act; it was the culmination of Ayala's months-long scheme to deprive Plaintiff of her rightful ownership interest, diminish her financial position, exclude her from the corporate structure she built, and consolidate all corporate wealth and intellectual property under his personal control. By dismantling the corporation and appropriating its assets, Ayala aimed to extinguish any trace of Plaintiff's decades-long contributions to the enterprise.

118. The consequences of the dissolution were immediate and severe. Plaintiff lost her fifty-percent ownership stake in a highly valuable entertainment

enterprise, including the music masters, brand equity, trademark rights, and long-term revenue streams that she helped develop. Ayala enriched himself by at least the fifty-million-dollar dividend that had been reversed, the one hundred eighteen million dollars withdrawn from corporate accounts, and the incalculable value of the intellectual property and goodwill transferred to him during dissolution.

119. Ayala's unlawful dissolution of El Cartel Records, Inc., coupled with the unauthorized transfers, disregard of judicial mandates, and fraudulent representations made to banks and courts, form a continuous pattern of intentional misconduct. This pattern evidences a coordinated scheme to deprive Plaintiff of property, destroy her financial and corporate interests, and eliminate her from the business operations she legally co-owned and faithfully managed for more than two decades.

## L.   Resulting Damages and Continuing Harm to Plaintiff

120. As a direct and proximate result of Defendants' coordinated actions, Plaintiff Mireddys González Castellanos has suffered severe, ongoing, and compounding damages that extend well beyond the initial removal of her $50,000,000 dividend. The unauthorized ACH reversal executed on December 12, 2024 immediately deprived Plaintiff of her vested personal financial property, stripped her of liquidity to which she was lawfully entitled, and undermined her financial security. The loss was not temporary or technical; it represented the complete removal of funds that

54

had already settled, been credited, and become Plaintiff's property under governing banking law and corporate resolutions.

121. The deprivation of Plaintiff's dividend was followed by continuing financial harm caused by Defendants' refusal to correct the reversal after Plaintiff placed them on notice and demanded explanation. By declining to investigate, restore the funds, or provide documentation, Defendants prolonged the deprivation and converted what could have been a correctable banking error into a sustained loss. Plaintiff was forced to expend substantial time, effort, and resources attempting to understand and respond to the reversal, including engaging in emergency communications with financial institutions, preparing filings in state court, and seeking legal assistance to protect her rights. These efforts resulted in additional out-of-pocket expenses, professional costs, and disruption to Plaintiff's business and personal affairs.

122. The harm escalated further when, following the reversal, Defendants facilitated or failed to prevent additional transfers of corporate funds in violation of a judicial freeze order issued on December 20, 2024. The continued movement and consolidation of corporate assets into accounts under Defendant Ayala's exclusive control deprived Plaintiff of access to corporate funds necessary to protect her ownership interest, to ensure operational continuity, and to maintain parity between the shareholders. As a result, Plaintiff suffered loss of corporate control, loss of financial

transparency, and loss of the ability to safeguard corporate assets pending judicial resolution.

123. Defendant Ayala's January 10, 2025 withdrawal of approximately $118,000,000 from a corporate account further compounded Plaintiff's damages. That unilateral removal of corporate funds eliminated the remaining liquidity of the corporations, deprived Plaintiff of her right to one-half of the retained earnings, and effectively rendered her ownership interest economically hollow. Plaintiff was left without access to funds necessary to operate, stabilize, or wind down the corporations, while Ayala consolidated control over all liquid assets. This imbalance caused lasting damage to Plaintiff's financial position and bargaining power and destroyed the economic equilibrium that had existed between the shareholders.

124. Plaintiff has also suffered reputational harm as a result of Defendants' actions and the narratives advanced to justify them. The characterization of Plaintiff's lawful dividend as an "error," an "unauthorized transfer," or a "loss" created false impressions regarding her integrity, competence, and compliance with corporate governance. These mischaracterizations were disseminated through banking communications, legal filings, and related proceedings, harming Plaintiff's standing in the business and entertainment communities in which trust, credibility, and financial probity are essential. The reputational damage has impaired Plaintiff's

ability to engage in business relationships, negotiate contracts, and maintain professional goodwill built over decades.

125. The financial and reputational harms have been accompanied by significant emotional distress. Plaintiff has endured anxiety, humiliation, and uncertainty resulting from the sudden loss of a substantial portion of her personal wealth, the exclusion from corporate decision-making, and the ongoing litigation required to address Defendants' conduct. The stress associated with the deprivation of her property, the erosion of her professional reputation, and the protracted efforts to recover her rights has caused continuing mental and emotional suffering.

126. Defendants' conduct has also inflicted continuing harm by obstructing Plaintiff's ability to obtain timely and complete information regarding the status of corporate and personal accounts. The lack of transparency, the refusal to provide documentation, and the reliance on internal legal determinations in place of lawful procedures have prevented Plaintiff from fully assessing the scope of the damage and from taking steps to mitigate further losses. This concealment has delayed recovery, increased uncertainty, and exacerbated the overall harm.

127. The damages suffered by Plaintiff are ongoing. The $50,000,000 dividend remains unrecovered. The corporate funds withdrawn by Ayala have not been restored. Plaintiff continues to incur costs associated with litigation, forensic review, and efforts to protect remaining assets. The loss of

liquidity, control, and reputation continues to affect Plaintiff's personal and professional life, and the full extent of the financial impact cannot yet be precisely quantified.

128. Defendants' actions were not isolated mistakes but part of a continuing course of conduct that has caused cumulative harm. The initial reversal, the refusal to correct it, the violation of the judicial freeze order, and the subsequent withdrawal of corporate funds together constitute a chain of events that foreseeably and proximately caused Plaintiff's damages. Each Defendant's conduct contributed to the injury, and the resulting harm flows directly from the acts and omissions alleged throughout this Complaint.

129. As a result of Defendants' conduct, Plaintiff seeks recovery of all compensatory damages, consequential damages, and other relief available under federal law and the laws of the Commonwealth of Puerto Rico, as further set forth in the Causes of Action and Prayer for Relief. The continuing nature of the harm underscores the necessity of judicial intervention to restore Plaintiff's property, halt further injury, and prevent Defendants from benefiting from their unlawful actions.

## V.    CAUSES OF ACTION (COUNTS I–XIV)

### COUNT I
### Violations of the Electronic Fund Transfer Act ("EFTA")
### 15 U.S.C. §§ 1693–1693r; Regulation E, 12 C.F.R. Part 1005
### Against All Defendants

130. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 132 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein. This cause of action arises under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693–1693r, and its implementing regulation, Regulation E, 12 C.F.R. Part 1005. The EFTA imposes mandatory, non-discretionary obligations on financial institutions and their agents to protect consumers against unauthorized electronic debits, to refrain from removing funds from a consumer's account absent lawful authorization, to provide timely notice and documentation of electronic fund transfers, and to conduct a good-faith error-resolution investigation when a consumer disputes a transaction. These statutory protections are designed to prevent precisely the type of unilateral, undocumented, and uninvestigated deprivation of consumer funds that occurred in this case.

131. At all relevant times, Plaintiff Mireddys González Castellanos was a "consumer" within the meaning of 15 U.S.C. § 1693a(5), and her personal account at Oriental Bank was a "consumer account" under 15 U.S.C. § 1693a(2). Defendants FirstBank Puerto Rico and Oriental Bank are "financial institutions" within the meaning of 15 U.S.C. § 1693a(9). The ACH reversal executed on December 12, 2024 constituted an "electronic fund transfer" under 15 U.S.C. § 1693a(7). Once credited on December 11, 2024, the $50,000,000 dividend became Plaintiff's personal property held

in the custodial care of the defendant financial institutions and protected by federal law against unauthorized debit, reversal, or withdrawal.

132. No Defendant possessed Plaintiff's authorization, consent, or direction to debit her account. No legally cognizable error existed to justify removal of the funds pursuant to 15 U.S.C. §§ 1693d, 1693e, 1693f, or Section 907 of the EFTA. The debit was not initiated by Plaintiff, was not supported by a customer-initiated claim of error, and was not required by any court order. The reversal therefore constituted an unauthorized electronic fund transfer and an unlawful debit under federal law.

133. Upon discovering that her account had been emptied, Plaintiff immediately contacted FirstBank officers Nitza Franco and Edwin Arroyo and disputed the debit, protested that it was unauthorized and unsupported by any court order or documentation, and demanded an explanation for the reversal and the absence of notice. Although Plaintiff did not cite statutory provisions by name, the substance of her protest constituted timely notice of an unauthorized electronic fund transfer and triggered Defendants' mandatory obligations under the EFTA and Regulation E to investigate the transaction, provide documentation, and correct the debit if it was not lawfully authorized. Instead of complying with those duties, Defendants declined to initiate any error-resolution investigation, declined to provide documentation or notice, and affirmatively represented that the debit had been carried out pursuant to internal legal determinations and would not

60

be reviewed or corrected. This refusal constituted an independent and continuing violation of the EFTA.

134. On December 12, 2024, Defendants caused Plaintiff's personal account to be debited by $50,000,000 without authorization. As alleged in Sections F and G of this Complaint, the debit was executed pursuant to internal legal instructions following communications and coordination among Defendant Ramón Luis Ayala Rodríguez, his legal representatives, and the legal divisions of FirstBank Puerto Rico and Oriental Bank.

135. Defendant **Irma Ramos**, acting as Senior Vice President of Retail and Commercial Banking Operations at FirstBank, personally executed and certified four documents titled "Indemnity Agreement / Request for Return of Funds from ACH Transaction," falsely classifying Plaintiff's lawful, settled dividend as an "ACH error." Ramos initiated the ACH return process despite knowing, or being required to know by virtue of her position and training, that the transfers were authorized, completed, and irrevocable absent Plaintiff's consent or a court order. Her conduct violated EFTA Section 907, which prohibits debiting a consumer account without authorization or treating a completed transfer as erroneous without factual basis, as well as 15 U.S.C. §§ 1693d and 1693f, which require documentation, notice, and a compliant error-resolution investigation before any debit may occur.

136. Defendant **Edwin Arroyo**, acting as Chief of Operations of FirstBank, oversaw or facilitated the operational processing of the ACH return and later confirmed that the decision to reverse Plaintiff's funds originated from the legal divisions of FirstBank and Oriental Bank rather than from any automated error-detection process or judicial directive. By permitting the processing of the return without verifying authorization, without ensuring an EFTA-compliant investigation, and without ensuring consumer notice, Arroyo knowingly participated in and furthered the unlawful debit.

137. Defendant **Nitza Franco**, acting as a Branch Manager and/or supervisory officer of FirstBank, failed to notify Plaintiff of the impending debit, failed to verify authorization, and failed to escalate a transaction of extraordinary magnitude for customer confirmation. Her omissions materially contributed to the execution and concealment of the unauthorized debit and violated the EFTA's notice and documentation requirements.

138. Defendants **FirstBank Legal Division attorneys and personnel**, named herein as John and Jane Doe defendants, upon information and belief, authorized, approved, or directed the strategy to reverse Plaintiff's funds by misusing the ACH return mechanism to undo a completed transfer. These defendants knew or were charged with knowing that internal legal instruction cannot override federal statutory protections and that the EFTA prohibits debiting a consumer account absent authorization

or lawful error resolution. Their conduct constitutes knowing participation in EFTA violations.

139. Defendant **Oriental Bank**, acting as the Receiving Depository Financial Institution, and its legal, supervisory, and ACH operations personnel, accepted and processed the return request, debited Plaintiff's personal account, and returned the funds to FirstBank despite the absence of authorization, documentation, or a lawful error basis. Oriental failed to notify Plaintiff, failed to conduct any independent inquiry, and failed to reject an improper return, thereby violating 15 U.S.C. §§ 1693d, 1693f, and 1693h. Oriental is liable both directly and vicariously for the acts of its officers, employees, and agents.

140. Defendant **Ramón Luis Ayala Rodríguez**, although not a bank employee, knowingly induced and caused the EFTA violations by falsely asserting that Plaintiff's lawful dividend was unauthorized and by intervening with the banks to secure reversal of the funds. Ayala's judicial admission that the reversal occurred "through swift intervention by Ayala-Rodríguez" establishes his direct causal role. Ayala's legal representatives, named herein as Doe defendants, upon information and belief, collaborated with the banks' legal divisions to procure the unlawful debit, rendering them liable as aiders and abettors and joint tortfeasors under the EFTA.

141. At all relevant times, the individual bank defendants were trained, credentialed banking professionals who received mandatory training and

continuing instruction regarding the EFTA, Regulation E, UCC Article 4A, NACHA Operating Rules, and internal security and compliance procedures governing electronic fund transfers and reversals. By virtue of this training and their professional roles, Defendants knew or were required to know that a completed electronic fund transfer may not be reversed absent beneficiary authorization, a lawful error determination following statutory procedures, or a valid court order. They were trained to understand that misclassification of lawful transactions as "errors," misuse of ACH return codes, and failure to provide notice or investigation constitute violations of federal law.

142. Despite this knowledge and training, Defendants knowingly and willfully chose to proceed with the reversal of Plaintiff's funds. They bypassed the EFTA's error-resolution framework, withheld required documentation and notice, misrepresented the basis for the debit, and refused to investigate or correct the violation after Plaintiff placed them on notice. Defendants instead asserted that the matter was closed by internal legal determination, demonstrating conscious disregard for Plaintiff's federally protected rights.

143. Each Defendant is liable under the EFTA either directly or as an aider and abettor because each knowingly participated in, authorized, executed, supervised, induced, or concealed the unauthorized debit. The individual defendants are personally liable for their own acts and omissions. The

institutional defendants are liable both directly and vicariously for the acts of their officers, employees, agents, and legal representatives acting within the scope of their employment or authority. All Defendants are jointly and severally liable for the damages caused.

144. As a direct and proximate result of Defendants' knowing and willful violations of the Electronic Fund Transfer Act, Plaintiff suffered the loss of $50,000,000, loss of use of those funds, consequential economic damages, emotional distress, reputational harm, and continuing injury. Pursuant to 15 U.S.C. § 1693m, Plaintiff is entitled to recover actual damages, statutory damages, costs, reasonable attorneys' fees, and such declaratory and injunctive relief as the Court deems appropriate, including orders requiring restoration of the funds, prohibiting further unlawful debits or reversals, and compelling Defendants to comply with the EFTA and Regulation E going forward.

**COUNT** II – **Violations of UCC Article 4A – Improper Execution and Improper Revocation of Payment Orders, P.R. Laws Ann. tit. 19, §§ 651–680 Against All Defendant**

145. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 147 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under Article 4A of the Uniform Commercial Code, as adopted in the Commonwealth of Puerto Rico at P.R. Laws Ann. tit. 19, §§ 651–680. Article 4A governs electronic funds transfers

and establishes mandatory rules concerning the authorization, acceptance, finality, execution, cancellation, and revocation of payment orders. The statute allocates risk and liability to financial institutions that improperly execute or unlawfully revoke payment orders and strictly limits the circumstances under which a completed transfer may be undone.

146. At all relevant times, Plaintiff Mireddys González Castellanos was the beneficiary of payment orders within the meaning of Article 4A. Defendant FirstBank Puerto Rico acted as the originating depository financial institution and sending bank that transmitted the payment orders through the ACH network. Defendant Oriental Bank acted as the receiving and beneficiary's bank that accepted and credited the payment orders to Plaintiff's personal account. Each Defendant was therefore directly subject to the duties and prohibitions imposed by Article 4A.

147. On December 11, 2024, FirstBank transmitted, and Oriental Bank accepted and credited, payment orders totaling $50,000,000 to Plaintiff's personal account pursuant to valid corporate resolutions and lawful instructions. Upon acceptance and credit by Oriental Bank, the payment orders became final and irrevocable under UCC §§ 4A-209 and 4A-215. At that moment, Plaintiff acquired an enforceable right to the funds, and neither FirstBank nor Oriental Bank retained authority to cancel, amend, or revoke the payment orders absent Plaintiff's consent or a valid court order.

148. On December 12, 2024, Defendants caused the payment orders to be cancelled, revoked, and reversed after acceptance, without Plaintiff's consent and without any judicial mandate. The reversal was not the result of a sender-initiated cancellation prior to acceptance and was not authorized under any provision of Article 4A permitting post-acceptance cancellation. Instead, as alleged in Sections F and G of this Complaint, the reversal was executed pursuant to internal legal instructions following communications and coordination among Defendant Ramón Luis Ayala Rodríguez, his legal representatives, and the legal divisions of FirstBank and Oriental Bank.

149. Defendant **FirstBank Puerto Rico** is primarily and directly liable under Article 4A because it initiated and directed the improper revocation of the payment orders after acceptance. Through its legal division and Retail and Commercial Banking Operations, FirstBank mischaracterized lawful, completed transfers as "errors," issued return instructions through the ACH system, and caused the funds to be removed from Plaintiff's account. Under UCC §§ 4A-211, 4A-302, and related provisions, FirstBank bore the risk of loss for improper execution and unlawful revocation. The acts of FirstBank's officers, employees, agents, and legal personnel were undertaken within the scope of their employment and are imputed to FirstBank as a matter of law.

67

150. Defendant **Oriental Bank** is likewise primarily and directly liable under Article 4A because, as the beneficiary's bank, it accepted and credited the payment orders and thereafter debited Plaintiff's account and returned the funds without authority. Under UCC §§ 4A-209, 4A-215, and 4A-404, Oriental Bank had no right to revoke a final credit absent Plaintiff's consent or a court order. Reliance on FirstBank's return instruction does not excuse Oriental's violation of Article 4A. By honoring the return request and debiting Plaintiff's account after acceptance, Oriental committed an improper execution and unlawful revocation of the payment orders.

151. Defendant **Irma Ramos**, acting as Senior Vice President of Retail and Commercial Banking Operations at FirstBank, personally executed and certified documents initiating the ACH return and falsely classifying the completed transfers as "errors." By doing so, Ramos directly caused the improper revocation of the payment orders in violation of UCC § 4A-211. As a senior banking executive responsible for funds-transfer compliance, Ramos knew or was required to know that Article 4A prohibits revocation of accepted payment orders without beneficiary consent or judicial authorization.

152. Defendant **Edwin Arroyo**, acting as Chief of Operations of FirstBank, supervised or facilitated the operational execution of the revocation and confirmed that the decision to reverse Plaintiff's funds originated from the

legal divisions of FirstBank and Oriental Bank rather than from any mechanism authorized by Article 4A. By permitting or supervising the post-acceptance revocation of the payment orders, Arroyo participated in the improper execution and unlawful cancellation of the transfers.

153. Defendant **Nitza Franco**, acting as a Branch Manager and/or supervisory officer of FirstBank, failed to notify Plaintiff, failed to verify authorization, and failed to halt or escalate the improper revocation of an extraordinarily large payment order. Her omissions materially contributed to the execution of an Article 4A-prohibited cancellation and to the deprivation of Plaintiff's rights as beneficiary of final payment orders.

154. Defendants **FirstBank Legal Division attorneys and personnel**, identified as John and Jane Doe defendants, upon information and belief, authorized and directed the strategy to undo the completed payment orders by misusing ACH return mechanisms to effect a revocation that Article 4A forbids. These defendants knew or were charged with knowing that internal legal determinations cannot override the statutory finality of accepted payment orders and that revocation after acceptance is prohibited absent beneficiary consent or court order. Their conduct constitutes knowing participation in Article 4A violations.

155. Defendant **Ramón Luis Ayala Rodríguez**, although not a bank, knowingly induced and caused the Article 4A violations by intervening with the banks, falsely asserting that the completed transfers were

unauthorized, and procuring their revocation. Ayala's judicial admission that the reversal occurred "through swift intervention by Ayala-Rodríguez" establishes his direct causal role in the improper revocation of the payment orders. Ayala's legal representatives, named as Doe defendants, upon information and belief, collaborated with the banks' legal divisions to procure the unlawful revocation, rendering them liable as aiders and abettors and joint participants in the Article 4A violations.

156. At all relevant times, the individual bank defendants were trained and experienced banking professionals who received instruction regarding Article 4A, including the principles of acceptance, finality, and irrevocability of payment orders. By virtue of this training and their professional roles, Defendants knew or were required to know that a completed payment order cannot be cancelled or revoked absent beneficiary consent or judicial authorization. Their decision to proceed notwithstanding that knowledge demonstrates willful and knowing disregard of Article 4A's requirements.

157. As a direct and proximate result of Defendants' violations of UCC Article 4A, Plaintiff suffered the loss of $50,000,000, loss of use of those funds, consequential economic damages, and continuing injury. Under Article 4A and applicable Puerto Rico law, Defendants are liable for the amount of the improperly revoked payment orders, interest, consequential damages

where applicable, and equitable relief restoring Plaintiff's rights as beneficiary.

158. Each Defendant is liable either directly, vicariously, or jointly and severally because each authorized, executed, supervised, induced, or concealed the improper execution and unlawful revocation of the payment orders. Plaintiff seeks all relief available under Article 4A and applicable law, including restitution of the funds, interest, costs, and such further legal and equitable relief as the Court deems just and proper.

**COUNT III**
**CIVIL CONSPIRACY AND AIDING & ABETTING**
**UNDER PUERTO RICO CIVIL CODE ARTICLE 1802**
**Against All Defendants**

159. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 147 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under **Article 1802 of the Puerto Rico Civil Code**, which imposes liability on any person who, by act or omission, causes harm to another through fault, negligence, bad faith, or intentional misconduct. Under Puerto Rico law, **civil conspiracy and aiding-and-abetting are not standalone causes of action**, but are **recognized bases for joint and several liability** where two or more actors knowingly agree to participate in, facilitate, or further tortious conduct that results in harm. Liability attaches to **each participant in the unlawful scheme**, regardless of whether each defendant committed every

act, so long as each knowingly contributed to or benefited from the tortious result.

160. At all relevant times, Plaintiff Mireddys González Castellanos possessed lawful ownership and possessory rights to the $50,000,000 dividend credited to her personal bank account. The unauthorized reversal of that transfer, the refusal to investigate or correct it, the violation of a judicial freeze order, and the subsequent misappropriation and consolidation of corporate assets constituted tortious conduct under Puerto Rico law, causing Plaintiff substantial financial, reputational, and emotional harm.

161. Defendants **Ramón Luis Ayala Rodríguez**, his legal representatives, the legal divisions of **FirstBank Puerto Rico** and **Oriental Bank**, and the individual bank officers and employees named herein **acted pursuant to a common plan and agreement** to deprive Plaintiff of her personal and corporate property interests. Upon information and belief, Ayala and his attorneys communicated with and met with the legal divisions of FirstBank and Oriental Bank to challenge Plaintiff's lawful dividend, to portray it as unauthorized or improper, and to secure its reversal despite the absence of any signatory authority, judicial order, or lawful error basis. These communications resulted in a **meeting of the minds** as to how the reversal would be effectuated through misuse of banking mechanisms.

162. Pursuant to that agreement, FirstBank's Legal Division and Oriental Bank's Legal Division coordinated and authorized a course of action to

undo a fully settled electronic transfer by mischaracterizing it as an "error" and invoking ACH return procedures that were known, or should have been known, to be inapplicable and unlawful under federal and Puerto Rico banking law. Those legal-division determinations were then transmitted to operational and supervisory personnel for execution.

163. In furtherance of the conspiracy, Defendant **Irma Ramos**, acting as Senior Vice President of Retail and Commercial Banking Operations at FirstBank, executed and certified return documentation falsely labeling the completed dividend as an error. Defendant **Edwin Arroyo**, acting as Chief of Operations, supervised or facilitated the processing of the reversal and confirmed that the decision originated from the banks' legal divisions. Defendant **Nitza Franco**, acting as a supervisory and customer-facing officer, failed to notify Plaintiff, failed to verify authorization, and failed to escalate the transaction for compliance review, thereby enabling the reversal to proceed without customer knowledge. Each of these acts constituted **overt acts** taken in furtherance of the agreed-upon scheme.

164. Defendant **Oriental Bank**, acting through its legal, supervisory, and ACH operations personnel, knowingly accepted and processed the improper return request, debited Plaintiff's account, and returned the funds to FirstBank after acceptance of the transfer. Oriental's actions were not ministerial; they required discretionary approval and execution in

73

circumstances where no lawful basis for reversal existed. Oriental thereby **aided and abetted** the tortious deprivation of Plaintiff's property.

165. Defendant **Ramón Luis Ayala Rodríguez** knowingly induced and benefited from the conspiracy by asserting false claims regarding Plaintiff's authority, intervening with the banks to secure reversal of her dividend, retaining his own identical dividend, and later consolidating corporate funds under his exclusive control. Ayala's judicial admission that the reversal occurred through his "swift intervention" confirms his active role and intent. Ayala's legal representatives, upon information and belief, exceeded the bounds of legitimate advocacy by actively participating in communications and coordination that facilitated the unlawful banking actions, thereby aiding and abetting the tort.

166. At all relevant times, the bank defendants and their employees were trained and experienced professionals who knew, or were charged with knowing, that the actions taken—reversing a settled transfer without authorization, refusing to investigate after notice, and disregarding a court order—were unlawful and would cause harm to Plaintiff. Their decision to proceed nonetheless establishes **intentional misconduct or, at minimum, reckless disregard** for Plaintiff's rights, satisfying the fault requirement of Article 1802.

167. As a direct and proximate result of Defendants' concerted actions and knowing assistance, Plaintiff suffered the loss of $50,000,000, loss of

74

corporate parity and control, reputational harm, emotional distress, litigation expenses, and continuing economic injury. Each Defendant's conduct was a substantial factor in causing the harm, and the harm was a foreseeable consequence of the agreed-upon course of conduct.

168. Under Puerto Rico law, **all Defendants are jointly and severally liable** for the damages caused by the conspiracy and aiding-and-abetting conduct. Each Defendant is liable for the full extent of Plaintiff's damages, regardless of the degree of participation, because each knowingly contributed to or facilitated the tortious result.

169. Plaintiff therefore seeks all damages and relief available under Article 1802, including compensatory damages, consequential damages, emotional distress damages, costs, and such equitable relief as the Court deems just and proper to redress the harm and prevent further misconduct.

### COUNT IV.
### BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against FirstBank Puerto Rico and Oriental Bank)

170. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 172 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under the laws of the Commonwealth of Puerto Rico governing contractual obligations, including the Puerto Rico Civil Code and the well-established doctrine that every contract carries an implied covenant of good faith and fair dealing. Plaintiff Mireddys

González Castellanos brings this claim solely against Defendants FirstBank Puerto Rico and Oriental Bank based on their contractual relationships with Plaintiff and the duties arising therefrom.

171. At all relevant times, Plaintiff maintained valid and enforceable deposit-account agreements and related banking contracts with FirstBank Puerto Rico and Oriental Bank. These agreements governed the handling of Plaintiff's personal and corporate funds, the execution and receipt of electronic fund transfers, the security and custody of deposits, and the procedures for debiting, reversing, or modifying transactions. The contracts also incorporated, either expressly or by operation of law, applicable federal and Puerto Rico banking regulations, including duties of authorization verification, transaction integrity, notice, and lawful execution.

172. Under the express terms of these agreements, and under Puerto Rico contract law, FirstBank and Oriental were obligated to safeguard Plaintiff's funds, to process authorized transactions accurately, to refrain from debiting or reversing funds absent proper authorization or lawful basis, to follow established security procedures, and to act in good faith in the performance and enforcement of their contractual obligations. These duties included an obligation not to abuse contractual discretion, not to act arbitrarily or capriciously, and not to use contractual mechanisms as a pretext to deprive a customer of funds to which she was lawfully entitled.

76

173. FirstBank breached its contractual obligations by initiating and executing the reversal of Plaintiff's $50,000,000 dividend without Plaintiff's authorization, without a valid error basis, and without compliance with the security and verification procedures incorporated into the account agreements. FirstBank further breached the contract by mischaracterizing a lawful, completed transaction as an "error," by issuing return requests unsupported by fact, and by bypassing mandatory call-back and verification safeguards designed to protect customers from unauthorized debits. These actions were inconsistent with the express terms of the banking relationship and deprived Plaintiff of the benefit of her bargain.

174. Oriental Bank likewise breached its contractual obligations by debiting Plaintiff's account and returning funds after accepting and crediting the payment orders, without Plaintiff's consent and without lawful authority. As Plaintiff's depository institution, Oriental was contractually obligated to maintain the integrity of credited funds, to reject improper reversal requests, to provide notice and explanation before debiting funds, and to act in accordance with the finality of settled transfers. By honoring an improper return request and removing Plaintiff's funds without authorization or notice, Oriental failed to perform its contractual duties in accordance with the agreement and applicable law.

175. In addition to breaching express contractual terms, both FirstBank and Oriental breached the implied covenant of good faith and fair dealing that

inheres in every contract under Puerto Rico law. That covenant required the banks to exercise any discretion under the contracts honestly, reasonably, and in a manner consistent with the parties' justified expectations. Plaintiff reasonably expected that once a dividend was lawfully credited to her account, the banks would not arbitrarily reverse the transaction or deprive her of her funds based on internal preferences, third-party demands, or legal maneuvering unrelated to the contract's purpose.

176. Instead of acting in good faith, Defendants exercised contractual mechanisms in bad faith by using internal legal determinations and ACH return procedures as a pretext to undo a completed transaction for reasons unrelated to any legitimate contractual or banking concern. They refused to investigate Plaintiff's dispute, refused to correct the reversal after notice, and treated the contractual relationship as subordinate to extraneous interests, thereby frustrating Plaintiff's rights and defeating the essential purpose of the banking agreements.

177. Defendants' breaches were intentional, knowing, and in reckless disregard of Plaintiff's contractual rights. The banks were aware that their actions would deprive Plaintiff of her funds and undermine the trust and security that form the foundation of a banking relationship. Their conduct constituted a material breach that went to the heart of the contracts and destroyed Plaintiff's ability to rely on Defendants to safeguard her deposits.

178. As a direct and proximate result of Defendants' breaches of contract and breach of the implied covenant of good faith and fair dealing, Plaintiff suffered substantial damages, including the loss of $50,000,000, loss of use of those funds, consequential economic harm, reputational injury, emotional distress, and continuing financial damage. Plaintiff also incurred costs and expenses in attempting to address and mitigate the breaches.

179. Plaintiff is entitled to recover all damages available under Puerto Rico law for breach of contract and breach of the implied covenant of good faith and fair dealing, including compensatory and consequential damages, interest, costs, and such equitable relief as may be appropriate to restore Plaintiff's rights and prevent further contractual abuse by Defendants.

### COUNT V
### Negligence
### Puerto Rico Civil Code Article 1802
### (Against FirstBank Puerto Rico and Oriental Bank)

180. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 182 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under Article 1802 of the Puerto Rico Civil Code, which imposes liability on any person or entity that, by act or omission, causes harm to another through fault, negligence, or lack of due care. Plaintiff Mireddys González Castellanos brings this claim against

Defendants FirstBank Puerto Rico and Oriental Bank based on their negligent handling, reversal, and continued deprivation of Plaintiff's funds.

181. At all relevant times, FirstBank and Oriental owed Plaintiff a heightened duty of care arising from their roles as federally regulated financial institutions entrusted with the custody, processing, and protection of Plaintiff's personal and corporate funds. This duty included the obligation to act with reasonable care, diligence, and prudence; to comply with federal and Puerto Rico banking laws and industry standards; to independently verify authorization before debiting funds; to investigate disputed transactions; and to safeguard customer deposits against unauthorized removal. Given the extraordinary size of the transaction at issue, Defendants' duty of care was elevated and required heightened scrutiny, escalation, and compliance review.

182. FirstBank breached its duty of care by initiating and executing the reversal of Plaintiff's $50,000,000 dividend without independently verifying authorization, without identifying a legitimate error, and without complying with established security, verification, and investigation procedures. Rather than conducting a neutral and independent review, FirstBank relied exclusively on representations made by Defendant Ramón Luis Ayala Rodríguez and his legal representatives, despite Ayala's lack of signatory authority and despite Plaintiff's immediate objection and demand for explanation. FirstBank failed to examine the corporate

resolutions, failed to verify the beneficiary's rights, and failed to consult governing banking rules before acting, thereby departing from the standard of care required of a reasonable financial institution.

183. Oriental Bank likewise breached its duty of care by accepting and processing an improper return request and debiting Plaintiff's account after accepting and crediting the payment orders. As Plaintiff's depository institution, Oriental owed an independent duty to protect the integrity of credited funds, to reject unsupported or unlawful return requests, and to investigate disputes raised by the account holder. Instead of conducting its own investigation or suspending action pending clarification, Oriental relied on the originating bank's request and executed the debit without verifying lawful authority or notifying Plaintiff in advance.

184. Both FirstBank and Oriental further breached their duties by failing to freeze or suspend the account and transaction pending investigation once Plaintiff disputed the reversal. Standard banking practice and ordinary prudence require that, where ownership is contested, authorization is disputed, and the legality of a reversal is uncertain, the bank must preserve the status quo, escalate the matter to compliance or legal review, and refrain from executing or finalizing the transaction until the dispute is resolved. Defendants did the opposite: they proceeded with the reversal and allowed the funds to be removed, thereby magnifying the harm.

185. Defendants' negligence was compounded by their refusal to investigate after Plaintiff placed them on direct notice that the debit was unauthorized and unlawful. Despite Plaintiff's immediate demand for explanation and correction, Defendants failed to conduct any meaningful inquiry, failed to review the legality of the return, and failed to implement corrective measures. Instead, they represented that the matter had already been decided internally and declined to revisit the transaction, abandoning their duty of care at the moment it was most critical.

186. The negligent acts and omissions of FirstBank and Oriental were a direct and proximate cause of Plaintiff's injuries. But for Defendants' failure to investigate, failure to freeze the account, improper reliance on a third party's lawyers, and execution of an unsupported reversal, Plaintiff would not have been deprived of her $50,000,000 dividend, would not have lost access to corporate funds, and would not have suffered the cascading financial, reputational, and emotional harms alleged in this Complaint. The injuries were foreseeable consequences of Defendants' negligence, particularly in light of the magnitude of the transaction and the clear warning signs present at the time.

187. As a result of Defendants' negligence, Plaintiff sustained substantial damages, including but not limited to the loss of $50,000,000, loss of use of those funds, consequential economic losses, costs incurred in attempting to investigate and remediate the harm, emotional distress, reputational

injury, and continuing financial damage. Plaintiff's damages remain ongoing because Defendants have failed to restore the funds or take corrective action.

188. Defendants FirstBank Puerto Rico and Oriental Bank are jointly and severally liable under Article 1802 for the damages caused by their negligent acts and omissions. Plaintiff seeks all relief available under Puerto Rico law for negligence, including compensatory damages, consequential damages, interest, costs, and such equitable relief as the Court deems just and proper to redress the harm and prevent further negligent conduct.

**COUNT VI**
**CONVERSION – UNLAWFUL EXERCISE OF DOMINION OVER PROPERTY**
**PUERTO RICO CIVIL CODE ARTICLE 1802**
**Against FirstBank Puerto Rico, Oriental Bank, and Irma Ramos**

189. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 191as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under **Article 1802 of the Puerto Rico Civil Code**, which recognizes liability for conversion as the wrongful and unauthorized exercise of dominion or control over another's movable property, inconsistent with the owner's rights and resulting in deprivation of possession or use. Plaintiff Mireddys González Castellanos brings this claim against Defendants **FirstBank Puerto Rico**, **Oriental Bank**, and

83

**Irma Ramos**, whose acts and omissions resulted in the unlawful taking and retention of Plaintiff's personal funds.

190. At all relevant times, Plaintiff was the lawful owner of the $50,000,000 dividend credited to her personal bank account on December 11, 2024. Once the funds were credited and settled, they became Plaintiff's personal movable property, held in the custodial possession of the defendant banks solely for Plaintiff's benefit. Plaintiff had an immediate right to possession, use, and control of those funds.

191. Defendants FirstBank Puerto Rico and Oriental Bank exercised **unauthorized dominion and control** over Plaintiff's funds by debiting her account, reversing the settled transfer, and removing $50,000,000 without Plaintiff's consent, without a court order, and without any lawful basis. By unilaterally deciding to undo a completed transfer and depriving Plaintiff of possession of her funds, the banks acted in a manner inconsistent with Plaintiff's ownership rights and committed conversion under Puerto Rico law.

192. Defendant **Irma Ramos**, acting in her capacity as Senior Vice President of Retail and Commercial Banking Operations at FirstBank, personally participated in the conversion by executing and certifying documents that initiated the return of Plaintiff's funds and falsely labeling the lawful dividend as an "error." Ramos's execution of the return requests was a **direct act of dominion** over Plaintiff's property because it set in motion

84

the process that removed the funds from Plaintiff's account and returned them to FirstBank. Her conduct went beyond ministerial action and constituted personal participation in the wrongful taking.

193. The conversion was intentional or, at minimum, carried out with reckless disregard for Plaintiff's ownership rights. Defendants knew, or were required to know, that the funds had been credited, settled, and belonged to Plaintiff, and that no authorization existed to remove them. Nevertheless, Defendants exercised control over the funds for purposes unrelated to Plaintiff's rights and contrary to governing law, thereby depriving Plaintiff of possession and use of her property.

194. Defendants' dominion over Plaintiff's funds was **exclusive and complete**, leaving Plaintiff without access to or control over her money. The deprivation was not momentary or incidental; it resulted in the sustained removal of Plaintiff's funds and prevented her from exercising her ownership rights. The banks' continued refusal to restore the funds after Plaintiff's demand further confirms the conversion.

195. As a direct and proximate result of Defendants' conversion, Plaintiff suffered substantial damages, including the loss of $50,000,000, loss of use of the funds, consequential economic harm, emotional distress, reputational injury, and continuing financial damage. The conversion also set in motion additional harms alleged elsewhere in this Complaint,

including the depletion of corporate assets and Plaintiff's exclusion from financial control.

196. Under Puerto Rico law, **FirstBank Puerto Rico and Oriental Bank are jointly and severally liable** for the conversion of Plaintiff's funds because the acts of their officers and employees were undertaken within the scope of their employment and for institutional purposes. Defendant **Irma Ramos** is **personally liable** because she directly participated in and caused the conversion through her affirmative acts.

197. Plaintiff seeks all relief available under Article 1802 for conversion, including compensatory damages, consequential damages, interest, costs, and such equitable relief as the Court deems appropriate to restore Plaintiff's property and redress the unlawful exercise of dominion.

**COUNT VII**
**VICARIOUS LIABILITY – PUERTO RICO CIVIL CODE ARTICLE 1803**
**Against FirstBank Puerto Rico and Oriental Bank**

198. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 147 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under Article 1803 of the Puerto Rico Civil Code, which provides that employers and principals are liable for the damages caused by their employees, agents, officers, and representatives while acting within the scope of their employment or authority. Article 1803 establishes vicarious liability independent of the employer's own fault

86

and imposes joint and several responsibility for tortious acts committed by employees in the performance of their assigned functions.

199. At all relevant times, Defendants FirstBank Puerto Rico and Oriental Bank employed, retained, supervised, and exercised control over the individual defendants and Doe defendants identified throughout this Complaint, including but not limited to senior executives, operations officers, branch managers, ACH processing personnel, compliance staff, and legal-division attorneys. Each of these individuals acted as an employee, agent, or representative of the respective bank and was authorized to act on the bank's behalf with respect to the custody, processing, and handling of customer funds.

200. The wrongful acts and omissions described in this Complaint—including the unauthorized reversal of Plaintiff's $50,000,000 dividend, the improper execution and revocation of payment orders, the failure to investigate Plaintiff's objections, the refusal to freeze or suspend transactions pending review, the violation of a judicial freeze order, and the continued deprivation of Plaintiff's property—were committed by bank employees and agents while acting within the course and scope of their employment and in furtherance of the banks' business operations. These acts were undertaken using the banks' systems, authority, and institutional processes and were not personal frolics or acts outside the employees' assigned duties.

201. Specifically, with respect to FirstBank Puerto Rico, the acts of Defendant Irma Ramos, Edwin Arroyo, Nitza Franco, and the FirstBank Legal Division attorneys and personnel—including executing and certifying ACH return documentation, authorizing or directing the reversal strategy, processing and supervising the ACH return, failing to verify authorization, and failing to notify or investigate—were all performed in their official capacities and pursuant to their roles within FirstBank. These acts directly caused or contributed to the harm suffered by Plaintiff and are legally attributable to FirstBank under Article 1803.

202. With respect to Oriental Bank, the acts of its legal, supervisory, and ACH operations personnel—including accepting and processing an improper return request, debiting Plaintiff's account after acceptance of the payment orders, failing to notify Plaintiff, and failing to investigate or reject an unlawful return—were performed within the scope of their employment and in the course of Oriental's banking operations. Those acts are likewise attributable to Oriental Bank under Article 1803.

203. The banks' vicarious liability under Article 1803 exists regardless of whether the individual employees acted negligently, recklessly, or intentionally, and regardless of whether those individuals are also personally liable under Article 1802 or other statutory provisions. Puerto Rico law imposes vicarious liability precisely to ensure that entities

benefiting from employees' actions bear responsibility for the harms those actions cause when performed in the course of employment.

204. As a direct and proximate result of the tortious acts and omissions of their employees and agents, Defendants FirstBank Puerto Rico and Oriental Bank are jointly and severally liable for all damages suffered by Plaintiff, including the loss of $50,000,000, loss of use of those funds, consequential economic damages, emotional distress, reputational harm, and continuing injury.

205. Plaintiff therefore seeks judgment against FirstBank Puerto Rico and Oriental Bank under Article 1803 for all damages caused by their employees' and agents' conduct, together with interest, costs, and such equitable relief as the Court deems just and proper.

**COUNT VIII**
**DIRECT ACTION AGAINST INSURANCE XYZ**
**26 L.P.R.A. § 2003**
**Against Insurance XYZ**

206. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorough 208 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action is brought pursuant to **Puerto Rico's Direct Action Statute, 26 L.P.R.A. § 2003**, which expressly authorizes an injured party to bring a direct action against an insurer for damages caused by the insured's acts or omissions, to the same extent that the insured would be liable under the applicable policy. Plaintiff Mireddys González

Castellanos brings this Count solely against Defendant **Insurance XYZ** as the insurer of one or more defendants whose wrongful conduct caused Plaintiff's injuries.

207. Upon information and belief, at all relevant times, **Insurance XYZ** issued and maintained one or more valid and enforceable insurance policies, including but not limited to professional liability, bankers' blanket bond, fidelity bond, errors and omissions, and/or directors and officers liability policies, providing coverage to **FirstBank Puerto Rico**, **Oriental Bank**, and/or their officers, employees, agents, and representatives for acts and omissions arising out of banking operations, funds-transfer processing, custodial handling of customer assets, compliance failures, and related professional services.

208. The wrongful acts and omissions alleged in this Complaint—including the unauthorized reversal of Plaintiff's $50,000,000 dividend, the improper execution and revocation of payment orders, failures to investigate and freeze accounts, violation of statutory duties, negligence, conversion, and vicarious liability—were committed by insured entities and insured persons while acting within the scope of their employment or authority and in the course of insured banking operations. Those acts and omissions resulted in damages of the type covered, or potentially covered, under the policies issued by Insurance XYZ.

209. Insurance XYZ is therefore liable, **to the extent of the applicable policy limits**, for all damages for which its insureds are legally responsible, including compensatory damages, consequential damages, interest, costs, and such other relief as may be available under Puerto Rico law. Under 26 L.P.R.A. § 2003, Plaintiff's right of action against Insurance XYZ is **direct, independent, and cumulative**, and is not conditioned on first obtaining a judgment against the insured or exhausting remedies against the insured.

210. Plaintiff does not, at this stage, seek a determination of specific policy exclusions, conditions, or coverage defenses, which are matters of proof to be developed through discovery. Plaintiff alleges that coverage exists or may exist for the claims asserted, and that Insurance XYZ has actual or constructive notice of the insured events giving rise to this action.

211. As a direct and proximate result of the insureds' wrongful conduct, Plaintiff has suffered substantial damages, including the loss of $50,000,000, loss of use of those funds, consequential economic harm, emotional distress, reputational injury, and continuing damages. Insurance XYZ is liable under the Direct Action Statute for all such damages to the same extent as its insureds, subject to policy limits and applicable law.

212. Plaintiff seeks judgment against **Insurance XYZ** pursuant to 26 L.P.R.A. § 2003 for all covered damages caused by the insured defendants, together

with interest, costs, and such further relief as the Court deems just and proper.

## COUNT IX
## BREACH OF FIDUCIARY DUTY AND ILLEGAL CORPORATE DISSOLUTION
### Against Defendant Ramón L. Ayala Rodríguez

213. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 215 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.This cause of action arises under the **Puerto Rico General Corporations Act**, 14 L.P.R.A. §§ 3561 et seq., **Article 1802 of the Puerto Rico Civil Code**, 31 L.P.R.A. § 5141, and the well-established fiduciary principles recognized by Puerto Rico courts governing the conduct of corporate officers, directors, and shareholders in closely held corporations. These laws impose fiduciary duties of loyalty, care, good faith, and fair dealing; prohibit self-dealing, shareholder oppression, misappropriation of corporate assets, and unauthorized corporate dissolution; and provide a direct right of action for damages and equitable relief when such duties are breached. They further prohibit corporate fiduciaries from acting in defiance of binding court orders issued to preserve corporate assets and protect shareholder rights.

214. At all relevant times, Plaintiff Mireddys González Castellanos and Defendant **Ramón Luis Ayala Rodríguez** were each fifty-percent (50%) shareholders, officers, and directors of **El Cartel Records, Inc.** and **Los**

**Cangris, Inc.**, closely held corporations organized under the laws of the Commonwealth of Puerto Rico. By virtue of this status, Ayala owed Plaintiff and the corporations fiduciary duties of **undivided loyalty, utmost good faith, due care, candor, obedience to law, and non-oppression**, including the duty to preserve corporate assets, to respect Plaintiff's equal ownership and management rights, and to refrain from unilateral actions adverse to an equal co-owner.

215. Before the misconduct alleged herein, Ayala—through his own legal representatives—**expressly acknowledged Plaintiff's fifty-percent ownership** of El Cartel Records, Inc. and Los Cangris, Inc. in written communications addressed to Plaintiff, and requested that she execute corporate resolutions in her capacity as equal shareholder. These acknowledgments establish Ayala's **actual knowledge** of Plaintiff's ownership, authority, and fiduciary parity, and eliminate any conceivable good-faith belief that he could act unilaterally with respect to corporate funds, governance, or dissolution.

216. Ayala breached his fiduciary duties by engaging in a calculated and deliberate course of conduct designed to **strip Plaintiff of her lawful financial and ownership interests** and to consolidate exclusive control over corporate assets. As detailed elsewhere in this Complaint, Ayala intervened to cause the reversal of Plaintiff's $50,000,000 dividend while retaining his own identical distribution, misrepresented Plaintiff's lawful

receipt of funds as improper, and facilitated the redirection and removal of corporate assets for his personal benefit. These acts constitute **self-dealing, bad faith, and shareholder oppression** in violation of Puerto Rico corporate law.

217. Ayala's misconduct was aggravated by his **willful, purposeful, and knowing violation of a binding court order** issued by the **Puerto Rico Court of First Instance**. That order expressly prohibited the removal or transfer of corporate funds without Plaintiff's consent and required that any transaction exceeding **one hundred thousand dollars ($100,000)** receive Plaintiff's prior approval. Ayala had actual notice of the order. Nevertheless, he **deliberately disregarded the court's mandate**, caused or benefited from transfers and withdrawals exceeding the court-imposed threshold without Plaintiff's consent, and acted as though judicial authority and statutory obligations did not apply to him.

218. Ayala's violation of the court order was not inadvertent, negligent, or mistaken. It was **intentional and contumacious**, undertaken with full awareness of Plaintiff's rights, the court's explicit directives, and the legal consequences of defying them. By acting in open disregard of judicial authority, Ayala demonstrated **willful contempt for the law** and a conscious indifference to the foreseeable harm caused by depriving Plaintiff of her legitimate property interests and corporate assets. Under Puerto

94

Rico law, such conduct constitutes an **independent and severe breach of fiduciary duty**, compounding his liability.

219. In addition to these breaches, Ayala engaged in an **illegal corporate dissolution** by unilaterally dissolving **El Cartel Records, Inc.** without valid authorization from the board of directors or shareholders, without Plaintiff's consent as a fifty-percent shareholder and director, and without compliance with the statutory procedures governing corporate dissolution, notice, winding-up, and asset distribution. The dissolution was executed in bad faith for the improper purpose of extinguishing Plaintiff's ownership rights, preventing her from accessing corporate assets and revenues, and shielding Ayala's unilateral control from judicial scrutiny.

220. As a direct and proximate result of Ayala's **knowing and intentional breaches of fiduciary duty**, **willful violation of a court order**, and **illegal corporate dissolution**, Plaintiff has suffered substantial and continuing damages, including the loss of her $50,000,000 dividend, loss of access to corporate funds, destruction of corporate parity, diminution of the value of her ownership interest, reputational harm, emotional distress, and ongoing economic injury. The corporations themselves were also harmed through the unlawful depletion of assets, disruption of operations, and invalid dissolution.

221. Ayala's conduct was undertaken **without fear of the law or its consequences**, in bad faith, and with the specific intent to deprive

Plaintiff of her lawful rights and property. His actions violate the highest fiduciary standards imposed by Puerto Rico law and warrant the full measure of legal and equitable relief.

222. Plaintiff therefore seeks all relief available under the Puerto Rico General Corporations Act and Article 1802 of the Civil Code, including **compensatory and consequential damages**, **equitable relief nullifying and unwinding the illegal dissolution**, **restoration of corporate assets**, **accounting**, **injunctive relief preventing further dissipation of assets**, **interest**, **costs**, and such other relief as the Court deems just and proper to redress the harm and deter future violations of fiduciary duty and judicial authority.

**COUNT X**
**CIVIL THEFT AND MISAPPROPRIATION**
**UNDER PUERTO RICO CIVIL CODE ARTICLE 1802**
**Informed by Federal Fraud Standards**
**Against All Defendants**

223. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 225 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.  This cause of action arises under **Article 1802 of the Puerto Rico Civil Code**, 31 L.P.R.A. § 5141, which provides a civil remedy against any person who, by intentional act or omission, causes harm to another through fault, bad faith, or abuse of rights. Article 1802 prohibits the unlawful taking, diversion, or misappropriation of another's property and affords an

injured party a direct right of action for damages and equitable relief. Although this Count is grounded in Puerto Rico law, the wrongful intent and fraudulent character of Defendants' conduct are **informed by federal fraud standards**, including principles reflected in 18 U.S.C. §§ 1343 and 1344, which criminalize schemes to defraud and to obtain money through false representations and abuse of custodial authority. Those federal standards are referenced to establish **scienter, wrongful intent, and scheme**, not to assert a criminal claim.

224. At all relevant times, Plaintiff Mireddys González Castellanos was the lawful owner of the $50,000,000 dividend credited to her personal bank account on December 11, 2024, as well as an equal owner of corporate assets held by El Cartel Records, Inc. and Los Cangris, Inc. Defendants had no ownership interest in Plaintiff's personal funds and no lawful authority to appropriate, redirect, or retain those funds once credited.

225. Defendants **FirstBank Puerto Rico** and **Oriental Bank**, acting through their legal divisions, officers, employees, and agents, misappropriated Plaintiff's funds by intentionally reversing a settled electronic transfer, debiting Plaintiff's account, and removing $50,000,000 without authorization, without a court order, and without a lawful error basis. By exercising control over Plaintiff's funds for purposes unrelated to Plaintiff's rights and contrary to governing law, the banks committed civil theft and misappropriation under Article 1802.

97

226. Defendant **Irma Ramos**, acting as Senior Vice President of Retail and Commercial Banking Operations at FirstBank, personally participated in the misappropriation by executing and certifying documents falsely characterizing Plaintiff's lawful dividend as an "error," thereby initiating the process that removed the funds from Plaintiff's account. Ramos knew, or was required to know, that the funds belonged to Plaintiff and that no lawful basis existed to appropriate them. Her actions constituted intentional participation in the wrongful taking.

227. Defendants **Edwin Arroyo** and **Nitza Franco**, acting in supervisory and operational capacities, knowingly facilitated the misappropriation by allowing the reversal to proceed, failing to halt or investigate the removal of funds after Plaintiff objected, and refusing to restore the funds despite notice that the debit was unauthorized. Their conduct aided and abetted the misappropriation by enabling the continued deprivation of Plaintiff's property.

228. Defendants **FirstBank Legal Division attorneys and personnel** and **Oriental Bank Legal Division attorneys and personnel**, identified as John and Jane Doe defendants, knowingly participated in the misappropriation by authorizing, directing, or approving the strategy to reverse Plaintiff's funds based on false assertions that the transfer was unauthorized or erroneous. These defendants understood that Plaintiff's funds were lawfully credited and final, yet agreed upon and implemented

98

a scheme to reclaim the funds through misuse of banking mechanisms. Their actions demonstrate intentional wrongdoing and bad faith under Article 1802.

229. Defendant **Ramón Luis Ayala Rodríguez** knowingly participated in and benefited from the misappropriation by inducing the banks to reverse Plaintiff's dividend, falsely asserting that Plaintiff had no right to the funds, retaining his own identical dividend, and later consolidating corporate funds under his exclusive control. Ayala's judicial admission that the reversal occurred through his "swift intervention" establishes his role in causing the wrongful appropriation. Ayala's conduct reflects an intentional scheme to deprive Plaintiff of her property and to obtain financial benefit through abuse of banking and corporate processes.

230. Defendants **Ayala's legal representatives**, upon information and belief, aided and abetted the misappropriation by advancing false narratives regarding Plaintiff's authority, coordinating with bank legal divisions, and facilitating the execution of the reversal despite knowing that no lawful basis existed. Their conduct exceeded legitimate legal advocacy and entered the realm of active participation in a wrongful taking.

231. The misappropriation of Plaintiff's funds was **intentional, knowing, and carried out through deceptive and abusive means**, including false characterization of lawful transactions, misuse of custodial authority, concealment of the true basis for the reversal, and refusal to investigate or

correct the deprivation after notice. These acts satisfy the elements of civil theft and misappropriation under Article 1802, informed by federal fraud standards demonstrating a scheme to obtain or retain money through false pretenses and abuse of trust.

232. As a direct and proximate result of Defendants' civil theft and misappropriation, Plaintiff suffered substantial damages, including the loss of $50,000,000, loss of use of her funds, consequential economic harm, reputational injury, emotional distress, litigation expenses, and continuing financial damage. The harm was foreseeable and intended, and Defendants' conduct was a substantial factor in causing Plaintiff's losses.

233. Each Defendant is **jointly and severally liable** under Article 1802 because each knowingly participated in, induced, facilitated, or benefited from the misappropriation of Plaintiff's property. Liability attaches regardless of whether each Defendant physically possessed the funds, because Puerto Rico law imposes responsibility on all participants in a wrongful scheme that results in the unlawful taking of property.

234. Plaintiff seeks all relief available under Puerto Rico law for civil theft and misappropriation, including **compensatory damages**, **consequential damages**, **interest**, **costs**, **equitable relief**, **restitution**, and such other relief as the Court deems just and proper to restore Plaintiff's property and deter similar misconduct.

## COUNT XI

**UNJUST ENRICHMENT**
**PUERTO RICO CIVIL CODE ARTICLE 1795**
**(Against Defendant Ramón Luis Ayala Rodríguez)**

235. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 237 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.

236. This cause of action arises under **Article 1795 of the Puerto Rico Civil Code**, 31 L.P.R.A. § 5121, which provides that a person who is unjustly enriched at the expense of another is obligated to restore what was improperly received. Article 1795 affords a direct civil remedy where (i) the defendant has obtained a benefit, (ii) the plaintiff has suffered a corresponding impoverishment, (iii) there is a causal connection between the enrichment and the impoverishment, and (iv) there is no lawful justification for the enrichment.

237. At all relevant times, Plaintiff Mireddys González Castellanos was the lawful owner of a $50,000,000 dividend credited to her personal bank account on December 11, 2024, and an equal fifty-percent (50%) owner of the corporate assets of El Cartel Records, Inc. and Los Cangris, Inc. Plaintiff suffered a substantial and concrete impoverishment when her dividend was reversed and when corporate funds were subsequently removed and consolidated without her consent.

101

238. Defendant **Ramón Luis Ayala Rodríguez** obtained a **direct and substantial financial benefit** from the conduct alleged in this Complaint. As detailed in Sections F through J, Ayala induced the reversal of Plaintiff's $50,000,000 dividend while retaining his own identical distribution, thereby preserving for himself funds that would otherwise have been subject to equal division or judicial protection. Ayala further withdrew and consolidated corporate funds under his exclusive control, including a withdrawal of approximately $118,000,000, and acted to exclude Plaintiff from access to, control over, and benefit from those assets.

239. Ayala's enrichment was **directly caused** by the deprivation of Plaintiff's property. The reversal of Plaintiff's dividend, the refusal to restore it, the violation of a judicial freeze order requiring joint consent for transfers exceeding $100,000, and the unilateral removal of corporate funds all operated to shift economic value away from Plaintiff and toward Ayala. Plaintiff's loss and Ayala's gain are two sides of the same transaction and are causally linked.

240. There was **no lawful justification** for Ayala's enrichment. Ayala lacked authority to cause the reversal of Plaintiff's dividend, lacked consent to remove corporate funds unilaterally, and acted in knowing defiance of corporate law and a binding court order. Any benefit Ayala obtained was not the result of valid consideration, contractual entitlement, or lawful

corporate action, but rather the product of wrongful conduct designed to appropriate value belonging to Plaintiff.

241. Equity and good conscience require restitution. Under Puerto Rico law, unjust enrichment is available where, as here, other remedies may not fully restore the status quo and where retention of the benefit would be inequitable. Allowing Ayala to retain the financial gains obtained through the deprivation of Plaintiff's rights would sanction inequity and reward misconduct.

242. As a direct and proximate result of Ayala's unjust enrichment, Plaintiff suffered damages including the loss of $50,000,000, loss of use of those funds, diminution of her ownership interest, and continuing economic harm. Ayala's enrichment continues so long as the funds and benefits remain in his possession or control.

243. Plaintiff therefore seeks **restitution and disgorgement** under Article 1795, including the return of all sums by which Ayala was unjustly enriched, the imposition of a **constructive trust** over improperly obtained assets, **pre- and post-judgment interest**, costs, and such further equitable relief as the Court deems just and proper to restore Plaintiff to the position she would have occupied absent the unjust enrichment.

244.

## COUNT XII

103

## DEFAMATION
### Against Defendant Ramón L. Ayala Rodríguez

245. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 147 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.

246. This cause of action arises under the **Puerto Rico Constitution**, **Article II, Sections 4 and 8**, which protect individual dignity, reputation, and privacy, and under **Article 1802 of the Puerto Rico Civil Code**, 31 L.P.R.A. § 5141, which provides a civil remedy against any person who, through fault, negligence, or intentional misconduct, causes harm to another. Puerto Rico law expressly prohibits false statements of fact that harm a person's reputation and affords an injured party the right to recover damages for defamation, including libel and slander.

247. At all relevant times, Plaintiff Mireddys González Castellanos was a private individual and a respected business executive with a long-standing professional reputation in the music, entertainment, and corporate management industries. Plaintiff was not a public figure for purposes of Puerto Rico defamation law, and therefore Defendant Ayala owed a duty to refrain from making false and defamatory statements of fact concerning her.

104

248. Defendant **Ramón Luis Ayala Rodríguez** made and caused to be made **false statements of fact** concerning Plaintiff, including statements asserting or implying that Plaintiff had engaged in unauthorized, improper, or illegal financial conduct, had attempted to misappropriate or "steal" corporate funds, or had wrongfully transferred money without authority. These statements were false. As detailed elsewhere in this Complaint, Plaintiff's receipt of the $50,000,000 dividend was lawful, corporately authorized, properly executed through banking channels, and mirrored by an identical distribution to Ayala himself.

249. Ayala **published** these false statements to third parties, including but not limited to financial institutions, legal counsel, court filings, and other persons and entities with whom Plaintiff maintained professional or business relationships. Ayala further caused the statements to be repeated and relied upon by banks and other actors, resulting in concrete adverse actions against Plaintiff, including the reversal of her funds and the impairment of her business standing. Publication occurred both in written form, including judicial pleadings and correspondence, and orally through communications made directly or indirectly to third parties.

250. The statements were **defamatory per se** under Puerto Rico law because they falsely accused Plaintiff of criminal, dishonest, or unethical conduct in her profession and business dealings. Such accusations naturally tend to injure reputation, lower a person in the estimation of the community,

and expose the person to contempt, distrust, or ridicule, without the need to prove special damages.

251. Ayala acted with at least **negligence**, and in fact with **actual knowledge of falsity or reckless disregard for the truth**, when making the statements. Ayala knew that Plaintiff was a fifty-percent (50%) owner of the corporations, knew that the dividend was authorized, and knew that he had received the same amount himself. His own judicial admissions and attached banking records contradict his accusations. Despite this knowledge, Ayala made and maintained false statements portraying Plaintiff as having engaged in wrongdoing, demonstrating bad faith and malicious intent.

252. As a direct and proximate result of Ayala's defamatory statements, Plaintiff suffered **actual damages**, including but not limited to reputational harm, loss of professional credibility, emotional distress, humiliation, anxiety, and damage to business relationships. Plaintiff was forced to defend her integrity in legal proceedings, banking disputes, and professional contexts, compounding the harm caused by the false accusations.

253. Ayala's defamatory conduct was **willful, intentional, and undertaken without fear of the law or regard for the consequences**, and formed part of a broader course of conduct designed to justify the deprivation of Plaintiff's property, to undermine her credibility, and to exclude her from

corporate control. Such conduct warrants the imposition of full compensatory damages and equitable relief under Puerto Rico law.

254. Plaintiff therefore seeks all relief available under the Puerto Rico Constitution and Article 1802 of the Civil Code for defamation, including **compensatory damages**, **damages for emotional distress**, **reputational damages**, **costs**, **interest**, and such further legal and equitable relief as the Court deems just and proper to redress the harm and deter future defamatory conduct.

## COUNT XIII
## DECLARATORY JUDGMENT
## 28 U.S.C. §§ 2201–2202
## Against All Defendants

255. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 257 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.

256. This cause of action arises under the **Declaratory Judgment Act**, 28 U.S.C. §§ 2201–2202, which authorizes federal courts to declare the rights, status, and other legal relations of interested parties in cases of actual controversy within the Court's jurisdiction. Plaintiff Mireddys González Castellanos seeks declaratory relief to resolve concrete, ongoing disputes concerning the legality of Defendants' conduct, the validity of the reversal of Plaintiff's funds, the scope of Defendants' duties under federal and Puerto Rico law, and the respective rights and obligations of the parties.

107

257. An **actual and justiciable controversy** exists between Plaintiff and Defendants. Defendants have asserted, through actions and representations, that they were legally authorized to reverse Plaintiff's $50,000,000 dividend, to refuse investigation or correction after Plaintiff's objection, to disregard a judicial freeze order, and to act unilaterally with respect to corporate funds and governance. Plaintiff disputes those assertions and contends that Defendants' conduct violated federal statutes, Puerto Rico law, contractual obligations, fiduciary duties, and binding court orders. The controversy is definite, concrete, and ongoing, and declaratory relief will serve a useful purpose in clarifying and settling the legal relations at issue.

258. Plaintiff seeks a declaration that the **December 12, 2024 reversal of Plaintiff's $50,000,000 dividend was unlawful**, unauthorized, and void, and that the funds credited to Plaintiff's account on December 11, 2024 became her personal property and could not lawfully be debited, reversed, or revoked absent her consent or a valid court order. Plaintiff further seeks a declaration that Defendants' actions violated the **Electronic Fund Transfer Act and Regulation E**, **UCC Article 4A as adopted in Puerto Rico**, and the **NACHA Operating Rules**, and that Defendants had no legal authority to mischaracterize a lawful, settled transfer as an "error."

108

259. Plaintiff also seeks a declaration that **Defendants were obligated to investigate Plaintiff's objection**, to provide documentation and notice, and to freeze or suspend transactions pending lawful resolution once Plaintiff disputed the debit, and that Defendants' refusal to do so violated their statutory, contractual, and common-law duties. A declaration on these issues is necessary to prevent Defendants from continuing to rely on internal legal determinations or third-party assertions to bypass mandatory consumer-protection and funds-transfer rules.

260. With respect to corporate governance and fiduciary obligations, Plaintiff seeks a declaration that **Defendant Ramón Luis Ayala Rodríguez owed fiduciary duties of loyalty, good faith, due care, and non-oppression** to Plaintiff as an equal shareholder, officer, and director of El Cartel Records, Inc. and Los Cangris, Inc., and that Ayala's unilateral actions to reverse Plaintiff's dividend, remove corporate funds, disregard a judicial freeze order, and dissolve a corporation without proper authorization were unlawful and void. Plaintiff further seeks a declaration that any corporate dissolution or transfer of corporate assets undertaken without Plaintiff's consent and in violation of statutory requirements is invalid and of no legal effect.

261. Plaintiff additionally seeks a declaration that **FirstBank Puerto Rico and Oriental Bank are liable for the acts of their employees and agents** acting within the scope of employment, and that individual

defendants who authorized, directed, or executed unlawful reversals or revocations may not evade liability by reliance on internal legal advice or third-party demands. Clarification of these legal duties is necessary to govern Defendants' future conduct and to prevent repetition of the unlawful actions alleged.

262. Declaratory relief is appropriate and necessary because the legal issues presented are not hypothetical or moot. Defendants' positions continue to affect Plaintiff's rights, including the continued deprivation of funds, the handling of corporate assets, and the risk of future unilateral action. A declaratory judgment will resolve uncertainty, guide the parties' future conduct, and complement the coercive relief sought in other counts.

263. Pursuant to **28 U.S.C. § 2202**, Plaintiff further seeks all supplemental and further relief necessary or proper to give effect to the declaratory judgment, including injunctive relief, restitution, accounting, and enforcement orders consistent with the Court's declarations.

**COUNT XIV**
**INJUNCTIVE RELIEF**
**(Ancillary to All Substantive Claims)**
**Against All Defendants**

264. Plaintiff realleges and incorporates by reference all preceding paragraphs 1 thorugh 266 as if fully set forth herein, and all preceding allegations, including Sections F through L of this Complaint, as though fully set forth herein.

265.    This Count seeks **injunctive relief** ancillary to and in aid of Plaintiff's substantive claims asserted in Counts I through XIII. Plaintiff proceeds under the Court's equitable authority pursuant to **Federal Rule of Civil Procedure 65**, the **Declaratory Judgment Act**, 28 U.S.C. §§ 2201–2202, the **Electronic Fund Transfer Act**, the equitable enforcement of **UCC Article 4A as adopted in Puerto Rico**, and applicable provisions of the **Puerto Rico Civil Code and General Corporations Act**. These authorities empower the Court to enjoin unlawful conduct, compel restoration of wrongfully taken property, preserve disputed assets, and prevent irreparable harm where legal remedies are inadequate.

266.    Plaintiff has suffered, and continues to suffer, **irreparable harm** as a result of Defendants' conduct. Defendants unlawfully reversed and revoked a settled $50,000,000 electronic funds transfer belonging to Plaintiff, refused to investigate or correct the deprivation after notice, violated statutory and contractual duties governing the custody of funds, disregarded a binding court order designed to preserve corporate assets, and engaged in conduct that continues to threaten further dissipation and concealment of Plaintiff's property. The ongoing deprivation of a unique and substantial sum of money, loss of control over personal and corporate assets, erosion of fiduciary and governance rights, and continuing risk of dissipation cannot be fully remedied by money damages alone.

267.  Plaintiff lacks an adequate remedy at law because Defendants' conduct is **ongoing and reasonably likely to recur** absent judicial intervention. Defendants have asserted and acted upon a purported right to reverse settled transfers, to rely on internal legal determinations or third-party demands in lieu of statutory safeguards, to disregard mandatory investigation and notice requirements, and to act unilaterally with respect to corporate assets and governance. Without injunctive relief, Plaintiff faces a substantial risk of continued or renewed deprivation of funds and further violations of law and court orders.

268.  Plaintiff has demonstrated a **likelihood of success on the merits** of her substantive claims. As set forth in detail throughout this Complaint, Defendants' actions violated the **Electronic Fund Transfer Act and Regulation E**, **UCC Article 4A**, **Puerto Rico contract law**, **Articles 1802 and 1803 of the Puerto Rico Civil Code**, the **Puerto Rico General Corporations Act**, and a binding order of the **Puerto Rico Court of First Instance**. The record includes completed and credited transfers, admissions by Defendants, documented corporate authority, explicit lack of authorization or court mandate for the reversal, and deliberate disregard of Plaintiff's objections.

269.  The **balance of equities** weighs decisively in Plaintiff's favor. Plaintiff seeks only to restore the status quo ante, to regain possession and control of property unlawfully taken from her, and to prevent further unlawful

112

conduct. Defendants have no legitimate interest in retaining, controlling, or further manipulating funds obtained through unauthorized and unlawful means. Compliance with the law imposes no undue hardship on Defendants.

270. The **public interest** strongly favors injunctive relief. Enforcement of federal consumer-protection statutes, commercial-law finality rules, fiduciary obligations, and judicial orders promotes confidence in the banking system, corporate governance, and the rule of law. Enjoining unauthorized debits, improper revocations of payment orders, and misuse of custodial authority serves the public interest and deters similar misconduct.

271. Accordingly, Plaintiff respectfully requests that the Court enter **preliminary and permanent injunctive relief**, including but not limited to orders:

272. **Directing any financial institution currently holding, controlling, or possessing the $50,000,000 originally credited to Plaintiff on December 11, 2024**—including FirstBank Puerto Rico, Oriental Bank, or any successor, affiliate, or agent—to **immediately identify, segregate, preserve, and hold those funds intact**, without transfer, encumbrance, dissipation, or setoff, pending further order of the Court;

273. **Compelling Defendant Ramón Luis Ayala Rodríguez to return the $50,000,000 to Plaintiff**, upon a finding that Plaintiff was unlawfully

113

deprived of her property, by causing the funds to be **re-credited to Plaintiff's original personal account at Oriental Bank**, or, in the alternative, by **issuing payment to Plaintiff by certified check, cashier's check, or other guaranteed instrument payable directly to Plaintiff**, so that she may determine where and how to deposit or safeguard her funds;

274. **Enjoining FirstBank Puerto Rico and Oriental Bank** from debiting, reversing, revoking, transferring, or otherwise interfering with Plaintiff's personal or corporate funds absent Plaintiff's express consent or a valid court order, and from relying on internal legal determinations or third-party demands to bypass mandatory authorization, investigation, notice, and verification requirements under federal and Puerto Rico law;

275. **Enjoining Defendant Ramón Luis Ayala Rodríguez** from causing, authorizing, facilitating, or benefiting from any transfer, withdrawal, dissipation, or encumbrance of corporate assets without Plaintiff's consent and in violation of fiduciary duties or court orders;

276. **Enjoining the enforcement or recognition of any corporate dissolution or asset transfer** undertaken without Plaintiff's consent and in violation of statutory requirements, and ordering preservation of corporate assets pending lawful disposition;

277. **Ordering, if necessary, that the disputed funds be placed into a court-supervised escrow account or the registry of the Court**,

114

pending final judgment, to ensure preservation and availability of the property at issue; and

278. Granting such **other and further injunctive or equitable relief** as the Court deems necessary to prevent irreparable harm, preserve the status quo, enforce its declarations and final judgment, and ensure Defendants' compliance with federal statutes, Puerto Rico law, and binding court orders.

279. Plaintiff further requests that the Court retain jurisdiction to **enforce, modify, and supervise** its injunctions as justice requires.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff **Mireddys González Castellanos** respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, jointly and severally as applicable, and grant the following relief:

### A. DECLARATORY RELIEF

1. Declaration Pursuant to **28 U.S.C. §§ 2201–2202** That:

   1) The December 12, 2024 reversal and revocation of Plaintiff's $50,000,000 electronic funds transfer was unlawful, unauthorized, and void;

   2) Plaintiff was the lawful owner of the $50,000,000 credited to her account on December 11, 2024;

   3) Defendants violated the **Electronic Fund Transfer Act and Regulation E**, **UCC Article 4A**, **Puerto Rico contract law**, **Articles 1802 and 1803 of the Puerto Rico Civil Code**, the **Puerto Rico General Corporations Act**, and a binding order of the **Puerto Rico Court of First Instance**;

4) Defendant Ramón Luis Ayala Rodríguez breached fiduciary duties owed to Plaintiff and engaged in illegal corporate dissolution and shareholder oppression;

5) Any corporate dissolution, transfer, or disposition of assets undertaken without Plaintiff's consent and in violation of statutory requirements is invalid and of no legal effect.

## B. INJUNCTIVE AND EQUITABLE RELIEF

2. Preliminary and permanent injunctions pursuant to **Federal Rule of Civil Procedure 65**, **28 U.S.C. §§ 2201–2202**, and the Court's inherent equitable powers:

1) Enjoining all Defendants from debiting, reversing, revoking, transferring, encumbering, or otherwise interfering with Plaintiff's personal or corporate funds absent Plaintiff's express consent or a valid court order;

2) Ordering any financial institution currently holding or controlling the $50,000,000 originally credited to Plaintiff to immediately identify, segregate, preserve, and hold those funds intact pending further order of the Court;

3) Compelling Defendant Ramón Luis Ayala Rodríguez to return the $50,000,000 to Plaintiff, either by re-crediting Plaintiff's original personal account at Oriental Bank or, alternatively, by issuing payment to Plaintiff by certified check, cashier's check, or other guaranteed instrument payable directly to Plaintiff;

4) Enjoining Defendant Ramón Luis Ayala Rodríguez from causing, authorizing, facilitating, or benefiting from any further dissipation or transfer of corporate assets without Plaintiff's consent;

5) Enjoining enforcement or recognition of any unlawful corporate dissolution or asset transfer and ordering preservation of corporate assets pending lawful disposition;

6) Ordering, if necessary, that the disputed funds be placed into a **court-supervised escrow account or the registry of the Court**;

7) Granting such other injunctive or equitable relief as the Court deems necessary to prevent irreparable harm and enforce compliance with federal and Puerto Rico law.

## C.  COMPENSATORY DAMAGES

116

3. An award of **compensatory damages** in an amount to be determined at trial, including but not limited to:

   **1)** The full principal amount of **$50,000,000** wrongfully reversed and misappropriated;

   **2)** Loss of use of those funds;

   **3)** Consequential and incidental economic damages;

   **4)** Damages arising from loss of corporate parity, governance rights, and asset control;

   **5)** Reputational injury and loss of professional standing;

   **6)** Emotional distress, mental anguish, humiliation, and anxiety.

### D. Statutory Damages

4. An award of all **statutory damages** authorized by law, including but not limited to damages under **15 U.S.C. § 1693m** (Electronic Fund Transfer Act), as applicable.

### E. Treble Damages (Where Authorized)

5. An award of **treble damages** or enhanced damages to the fullest extent permitted by applicable federal or Puerto Rico law for Defendants' willful, knowing, and bad-faith misconduct, including statutory multipliers where authorized.

### F. Punitive or Exemplary Damages (Where Permitted by Law)

6. An award of **punitive or exemplary damages**, to the extent permitted by applicable law, against individual defendants whose conduct was intentional, malicious, reckless, or in conscious disregard of Plaintiff's rights, to punish and deter similar misconduct.

### G. Unjust Enrichment and Restitution

7. An order of **restitution and disgorgement** requiring Defendants who were unjustly enriched to return all benefits wrongfully obtained, including the imposition of a **constructive trust** over misappropriated funds or assets.

### H. Accounting

117

**8.** An order requiring a **full accounting** of all personal and corporate funds transferred, withdrawn, reversed, or otherwise handled by Defendants, including identification of the current location and disposition of such funds.

**I.    Attorneys' Fees and Costs**

9. An award of **reasonable attorneys' fees, expert fees, and costs** pursuant to **15 U.S.C. § 1693m**, **26 L.P.R.A. § 2003**, and any other applicable statute, rule, or equitable doctrine.

**J.    Pre- and Post-Judgment Interest**

10. An award of **pre-judgment and post-judgment interest** at the maximum rate permitted by law.

**K.    Further Relief**

11. Such **other and further legal, equitable, or declaratory relief** as the Court deems just and proper to fully redress Plaintiff's injuries and to prevent future violations.

**JURY TRIAL DEMANDED:** Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right.

**RESPECTFULLY SUBMITTED**, this 12th day of December, 2025, in San Juan, Puerto Rico.

*s/Maria M. Pabon Lopez, Esq.*
Maria M. Pabon Lopez, Esq.
USDC No 206706
408 Shrewsbury Ct
Jefferson LA 70121
Tel. 504-756-5224
Email: mariamercedespabon@gmail.com

s